## MARYLAND CASUALTY CO. v. UNITED STATES.

No. 45659.

Court of Claims.

Jan. 3, 1944.

438

John J. Wilson, of Washington, D. C. (Whiteford, Hart & Carmody, of Washington, D. C., and H. Ellsworth Miller, of Baltimore, Md., on the brief), for plaintiff.

J. H. Sheppard, of Washington, D. C., and Samuel O. Clark, Jr., Asst. Atty. Gen. (Robert N. Anderson and Fred K. Dyar, both of Washington, D. C., on the brief), for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

MADDEN, Judge.

The plaintiff seeks to recover from the United States $1,987.22 which the plaintiff paid to materialmen and laborers whom the Columbia Foundation Company, Inc., failed to pay. Columbia had, about February 3, 1940, made a contract with the United States for the installation of a condensing water supply connection at the National Gallery of Art. It was required by law to furnish two separate bonds, one guaranteeing its performance of the contract, and the other guaranteeing its payment of materialmen and laborers from whom it might obtain supplies or services in the performance of the contract.[1] The plaintiff furnished the payment bond.

Columbia became financially unable to pay its bills and, when it completed the performance of the contract it left unpaid the materialmen and laborers who were later paid by the plaintiff. On January 7, 1941, which was after completion of performance but before the plaintiff, as surety, had paid Columbia's unpaid bills, the Comptroller General of the United States determined that there was a balance of $4,253.63 of the contract price, which the Government had not paid Columbia, but that Columbia was indebted to the United States in a larger amount than that, for income taxes and federal insurance contribution and unemployment taxes. The Comptroller General applied the balance against the taxes, and gave Columbia a receipt for the payment of that amount on its tax bill. When he did this, the Comptroller General did not know that Columbia had failed to pay its bills, or was unable to do so.

On January 22, 1941, the plaintiff, upon becoming aware of what the Comptroller General had done, protested against the set-off and demanded payment instead of the set-off. Columbia at the same time made a similar protest and demand. The plaintiff then paid Columbia's unpaid debts to materialmen and laborers in the amount of $1,984.75, and social security taxes on the wages paid by it, in the amount of $2.47, making the total amount here sued for $1,987.22. It made no attempt to obtain reimbursement from Columbia because it learned that Columbia had no assets. It sought to have the Comptroller General rescind the set-off, and pay it $1,987.22 out of the $4,253.63 which that official had determined was owing Columbia on its contract, but was used up as a credit on Columbia's unpaid taxes. That official, however, adhered to his former decision and denied the request.

Our question is whether the Government has the right to settle the unpaid balance which it owes a contractor for the performance of a certain contract, by setting off that balance against a debt which the contractor owes the Government upon some unrelated account, when there is a surety who has been obliged under its bond to pay debts of the contractor for materials and labor used by the contractor in the performance of its contract. In this case the contractor's debt to the Government was for taxes, but the Government does not claim that it had properly perfected a tax lien, or that the tax debt was different, in any respect material here, from any other debt which the contractor might have owed the Government, as, for example, for supplies sold to him by the Government.

One basis for the Government's asserted defense is that, because of Section 3466 of the Revised Statutes, 31 U.S.C.A. § 191, the United States, as a creditor, had priority over other creditors of Columbia, and therefore its paying itself by set-off gave it no more than it would have been entitled to in any event. That section is as follows: "Whenever any person indebted to the United States is insolvent, or whenever the estate of any deceased debtor, in the hands of the executors or administrators, is insufficient to pay all the debts due from the deceased, the debts due to the United States shall be first satisfied; and the priority established shall extend as well to cases in which a debtor, not having suffi-

---

[1] Act of August 24, 1935, c. 642, 49 Stat. 793, 40 U.S.C.A. § 270a.

cient property to pay all his debts, makes a voluntary assignment thereof, or in which the estate and effects of an absconding, concealed, or absent debtor are attached by process of law, as to cases in which an act of bankruptcy is committed." The plaintiff urges that this statute is not applicable except where, in the case of a living debtor, his insolvency is a formal one evidenced by a bankruptcy, receivership, or assignment for the benefit of creditors.

We agree with the plaintiff as to the construction of R.S. § 3466. A provision in similar language has been in the statutes since 1797 and has always been construed as plaintiff would have us construe it. See United States v. State of Oklahoma, 261 U.S. 253, 43 S.Ct. 295, 67 L. Ed. 638. We conclude, therefore, that the Government, as such, had no statutory preference which would give its claim priority over the plaintiff's claim.

We now reach the difficult legal question in the case. The plaintiff claims that as a surety which has paid the debt of its principal, it is entitled to be subrogated to the rights which its principal had, under the contract, including the right to collect so much of the unpaid balance due its principal from the other contracting party as is necessary to make it whole for payments made by it under its bond. The Government, in response, says that there was nothing for the plaintiff to be subrogated to, because Columbia, its principal, had no rights against the United States, since it owed taxes in a larger amount. The Government cites Globe Indemnity Co. v. United States, 84 Ct.Cl. 587. In that case the surety sued for the unpaid balance due the contractor from the Government, the surety having there, as here, paid labor and material bills of the contractor. But the contractor's claim against the Government had been forfeited, under the statute, for attempted fraud in the prosecution of it. The court held that the surety could not recover, and said "The party for whose benefit the doctrine of subrogation is exercised can acquire no greater rights than those of the party for whom he is substituted."

We think the Globe case was rightly decided. There the principal's claim became literally nonexistent as a result of the forfeiture under the statute, so of course neither the surety nor anyone else could enforce it. But most cases of subrogation, including the one now before us, involve only a question of priority, i. e. whether the surety or some other creditor of the principal has a better right to an admitted asset of the principal. In Prairie State Nat. Bank v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412, for example, the question was whether the surety who had expended money to complete the contract upon his principal's default, or the bank which had loaned money to the principal to finance the contract, had the better right to the balance due the principal from the United States, when the contract was completed. In that case, if the bank had had an assignment of the unpaid balance, good as against the principal, the assignor, it and not the principal would have been entitled to collect the money from the United States. But that would have proved nothing as to whether or not still another person, the surety, had a still better right than the assignee to get the money. So the surety's right by subrogation may give him, as it did in the Prairie State Nat. Bank case, supra, a right to money which, if there had been no surety, the principal would not have been entitled to because he had assigned his right, or had subjected it to a set-off or other valid defense not involving forfeiture of the claim.

A surety is entitled, by subrogation, to priority in valuables pledged by the principal debtor to the other contracting party as additional security for the performance of the contract. Arant on Suretyship, pp. 354, 355. In the case of the "performance" bond required by the Government of contractors, the money retained by the Government until performance is completed is retained for the purpose of securing performance. By proper analogy the contractor's right to that money, upon completion, should belong to the surety, so far as it is necessary to make him whole, and his claim to it should have priority over the claims of other creditors of the contractor, including claims of the Government which are unrelated to the contract. United States Fidelity & Guaranty Co. v. United States, 92 Ct.Cl. 144.

The bond involved in the instant case was not a "performance" bond, but a "payment" bond. It is not clear that moneys were withheld from the contractor in order to give the Government additional security that materialmen and laborers would be paid. So far as appears, the balance of the contract price would have been paid to Columbia, if it had not been credited on Columbia's taxes, without any investigation

as to whether Columbia had paid its materialmen and laborers. If so, that would indicate that the Government, which would have no more than a moral obligation to see these creditors paid, relies entirely on the payment bond with regard to such debts of the contractor. The analogy of subrogation to additional security may, therefore, not be properly applicable to the type of bond here involved.

The answer to our question should, we think, be looked for in the contract itself and its necessary implications. What did the parties mean? What risks did they intend the surety to undertake? The risks undertaken by a surety, and for which it receives its compensation, if it is, as the plaintiff is, a commercial surety, include the risk that the contractor, the principal, may receive the payments from the other contracting party, here the Government, and may spend the money in speculation or in riotous living and fail to pay his materialmen and laborers. The surety will then have to pay them. The surety also takes the risk that, by reason of the contractor's bad management, or of a rise in the cost of labor and materials, the payments made to the contractor will not be sufficient to pay the materialmen and laborers. But we do not think that it intends, or is expected by the Government or the other contracting party to take the risk that any part, or perhaps the whole, of the contract price which by the contract the Government promises to pay upon ⁓erformance, will be "paid," not in money but by a bookkeeping process of crediting these sums against taxes or other debts of the contractor not related to the contract, to the prejudice of the surety.

Suppose a contractor defaults, at some stage, early or late, in performance. The surety elects to complete performance in order to reduce its liability. It secures another contractor and enters into a contract with him for completion of the work. The work is completed. Then the Government says that the original contractor owed it more on other accounts than the unpaid contract price, hence the surety will be paid nothing, though it did some or most of the work covered by the original contract. If, in the same situation, the surety had not elected to complete the work, and the Government had finished the job itself, the surety would have been obliged to pay only the difference between the actual cost of completion and the part of the contract price which had not been paid the original contractor before his default.

In the first situation suggested above, the surety would have paid the original contractor's taxes or other debts to the Government. In the second it would not. We think that in no case is it intended that the surety transaction should work out in such a way that the surety has paid the contractor's taxes or unrelated debts to the Government.

The effect of the contract and the bonds is that the contractor promises the Government that it will build the structure, and will pay the laborers and materialmen. The Government takes two separate bonds to secure the fulfillment of these promises, since its interest in the first is more physical and direct than in the second. But when the surety pays the laborers and materialmen, it is performing the contract as much as when it completes the building. We see no more reason why the parties should intend that, either under the guise of building a building, or of paying laborers and materialmen, both of which the surety has promised will be done, it should in reality, and because of the ease of bookkeeping, be paying the contractor's taxes or other debts, which it has not promised will be done.

We construe the bond and the transaction as a whole as implying a promise on the part of the Government to the surety that it will not so settle the accounts of the contractor as to leave the surety in the position of paying the contractor's taxes. When the Comptroller General was made aware that that was the effect of his accounting, he should have rescinded the set-off. The fact that he had made the set-off without knowledge of its effect upon the surety's interest had no final effect upon the plaintiff's right. The credit given to Columbia on its taxes could have been cancelled, without any prejudicial change in the Government's position. This should have been done when the plaintiff's right became known.

The plaintiff may recover $1,987.22.

It is so ordered.

WHITAKER and LITTLETON, Judges, concur.

WHALEY, Chief Justice, concurs in the result.

JONES, Judge, took no part in the decision of this case.