UNIVERSAL SURETY COMPANY, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 374–85C.

United States Claims Court.

Sept. 18, 1986.

Richard S. Busch, Los Angeles, Cal., for plaintiff.

Michael T. Paul, with whom were Asst. Atty. Gen. Richard K. Willard, and Thomas W. Petersen, Washington, D.C., for defendant.

## OPINION

BRUGGINK, Judge.

Pending before the court is Defendant's Motion for Partial Summary Judgment, asserting that Count I of plaintiff's two-count complaint must be dismissed for lack of subject matter jurisdiction. The general issue to be resolved in this case is a novel one: does a surety have the right to assert, independently of the contractor, claims against the government for amounts other than the "contract price?" Upon consideration of the written and oral arguments of the parties, the court concludes that under the circumstances presented here, it does

not, and dismisses all but one claim of Count I.

## BACKGROUND

On April 7, 1982, Kener General Contractors, Inc. ("Kener") entered into a contract with the Department of the Army Corps of Engineers for the construction of a mobile home park for the price of $476,995.00. On the same day, plaintiff executed both a performance bond and a payment bond, in the sums of $476,995.00 and $238,497.50, respectively, naming Kener as principal and defendant as obligee, thereby assuring funds for completion of the contract. On September 9, 1982, plaintiff sent defendant a registered letter stating that it was "financially assisting Kener in providing you a timely completed project." Attached was a letter from Robert Lane, President of Kener, stating that his company had undergone a "temporary, but critical, cash-flow problem," and that it therefore had "turned to our bonding company for assistance." Based on the Lane letter, plaintiff went on to demand "that all further payments, including retention, be made payable to Universal."

Subsequently, in a letter dated January 10, 1983, Carole Lane, Secretary/Treasurer of Kener, instructed defendant that:

Kener was forced to find financial assistance from Universal Surety Co. because of the cash flow problem caused by the government's failure to meet progress payments. Kener has not assigned any government contracts to Universal Surety Co.

Although the precise circumstances and amounts are contested, it appears uncontroverted that in late 1982, plaintiff began fulfilling its obligations under either the performance or payment bonds or both [1] because of the financial instability of Kener. While plaintiff incurred losses on its bonds in the asserted amount of approximately $327,000.00, there was no written takeover agreement. Kener remained on the job and completed its work.

During the construction and after plaintiff began performing on its bonds, defendant issued a number of unilateral change orders in the work required, leading to adjustments, primarily downward, in the contract price. Plaintiff sought payment from defendant in the amount of $158,331.78 for these change orders. In addition, plaintiff claimed $41,570.13 in damages alleged to have resulted from the clean-up of a PCB contamination at the project site, $6,000 in increased excavation costs, and $54,371.54, an amount retained by the government because of alleged payroll discrepancies. Finally, plaintiff also sought $87,075.00 for contract progress payments allegedly erroneously sent to Kener after plaintiff had notified the government that further payments should be sent to it.

Kener submitted no claim at all to the contracting officer for these disputed amounts. Although plaintiff did submit a claim, it admits that it was not in total compliance with the requirements of the Contract Disputes Act, 41 U.S.C. §§ 601–613 (1982) ("CDA"). Plaintiff's claim was dismissed by defendant on the ground that it should have been submitted by Kener,

---

1. The complaint asserts that plaintiff's obligations were incurred under the performance bond. In its Proposed Findings of Additional Uncontroverted Facts, plaintiff asserts that losses were incurred against both the performance and payment bonds. While it appears that some of the monies must have been paid out pursuant to the performance bond since the total losses exceed the amount of the payment bond, plaintiff has not alleged that there was a default by Kener and that these circumstances gave rise to a de facto takeover agreement between it and defendant. *See Transamerica Insurance Co. v. United States,* 6 Cl.Ct. 367 (1984);

*Morrison Assur. Co. v. United States,* 3 Cl.Ct. 626 (1983). Indeed, such an argument would be inconsistent with plaintiff's submissions. Plaintiff submits the statement of G. Wayne Murphy, counsel for plaintiff, in which he represents that he was retained by plaintiff to "monitor the performance of Kener in the completion of this job.... Mr. Lane therefore requested that Universal provide financial assistance so that *Kener could complete its contract* with the government." Plaintiff's Opposition to Defendant's Motion for Partial Summary Judgment, 14 (emphasis added).

and action was instituted in this court on June 24, 1985.

## PLEADINGS

Plaintiff's complaint is based on its assertion that it paid claims against its performance bond in the sum of $327,000.00, and that it was therefore subrogated to all of Kener's interest in the contract, including the right to assert claims under the CDA. In Count I of its complaint, plaintiff seeks $260,273.45 as damages resulting from the five change orders and the additional expenses allegedly incurred.

In Count II of the complaint, plaintiff seeks payment for the progress payment allegedly made improperly to Kener. Solely with respect to Count II, defendant has made Kener a third-party defendant and seeks indemnification from it for any potential liability. Although service was completed on Kener, no appearance has been made and no answer filed to defendant's counterclaim. Count II is not at issue in the pending motion.

In its motion for summary judgment, defendant asserts as to Count I that the court lacks subject matter jurisdiction under the CDA because Kener did not file a properly certified claim with the contracting officer. It therefore seeks dismissal of Count I.

In subsequent briefing and argument, plaintiff states that the remedy sought in Count I is not dependent on a subrogation theory, and instead, that the surety agreement gives it direct privity of contract with defendant, so that it may recover either under the CDA or pursuant to 28 U.S.C. § 1491(a) (1982). More specifically, plaintiff asserts that it meets the definition of "contractor" contained in the CDA; that it filed a claim with the contracting officer; and that it therefore may bring this action under 41 U.S.C. § 609(a). Alternatively, plaintiff contends that if the court finds that it is not a "contractor" pursuant to the CDA, then it may rely on its alleged independent contractual relationship with the government, arising from the execution of the performance and payment bonds, naming the United States as obligee, to bring the action under 28 U.S.C. § 1491(a) without regard to the requirements of the CDA.

In reply, defendant asserts that sureties may bring contract actions against the government only under the doctrine of subrogation, and therefore that this action may not be grounded on 28 U.S.C. § 1491(a). Moreover, since the doctrine of subrogation is limited to claims against retained funds, plaintiff has no right to make claims for a price adjustment in the construction contract. With respect to plaintiff's attempt to rest jurisdiction on 41 U.S.C. § 609(a), defendant contends that because plaintiff was not a party to the construction contract, it was not a "contractor" under the CDA and cannot file a claim under it. In any event, defendant argues that plaintiff's attempt to submit a claim to the contracting officer under the CDA was ineffective because it failed to certify the claim in accordance with 41 U.S.C. § 605(c)(1).

## ANALYSIS

### A. *Subrogation*

The Court of Appeals for the Federal Circuit recently had occasion to discuss the remedies available to a construction contract surety against the government. In *Balboa Insurance Co. v. United States*, 775 F.2d 1158 (Fed.Cir.1985), the court pointed out that the traditional means by which a surety asserts a claim is under the equitable doctrine of subrogation. 775 F.2d at 1161. This is the theory advanced initially by plaintiff in its complaint. This doctrine developed in order to do justice to the one required to pay another's debt or perform another's duty, and was independent of any contractual relations between the parties. *Aetna Life Insurance Co. v. Middleport*, 124 U.S. 534, 549–50, 8 S.Ct. 625, 630, 31 L.Ed. 537 (1887); *Memphis & Little Rock Railroad v. Dow*, 120 U.S. 287, 302, 7 S.Ct. 482, 489, 30 L.Ed. 595 (1887); *National Surety Corp. v. Allen-Codell Co.*, 70 F.Supp. 189, 191 (E.D.Ky.1947). The surety has thus been held to have a

security interest in funds withheld by the owner, when it assumes the debts of the contractor. *See Pearlman v. Reliance Insurance Co.*, 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962).

Thus, if plaintiff were asserting an interest only in amounts retained by the government from the contract price, it would be clear that it has the right to proceed before this court as to Count I under a theory of equitable subrogation. *See United States Fidelity & Guaranty Co. v. United States*, 92 Ct.Cl. 144, 152–53 (1940). Similarly, it would have the right to seek to recover the amount of a progress payment alleged to have been improperly paid. *Balboa Insurance Co.*, 775 F.2d at 1163; *Great American Insurance Co. v. United States*, 202 Ct.Cl. 532, 481 F.2d 1298 (1973); *United States Fidelity & Guaranty Co. v. United States*, 201 Ct.Cl. 1, 475 F.2d 1377 (1973).

Defendant asserts that under this traditional approach, sureties may bring contract actions against the government only as subrogees and that subrogation rights extend *only to the contract balance*. An examination of the cases cited by defendant[2] and other authority,[3] supports its view. Although the question present here does not appear in any of those cases, what all the precedent does have in common is that the sureties' claims were limited to funds held by the government pursuant to the underlying contract. "Sureties ... may be subrogated to the rights of the United States to any funds or securities in its hands due the contractor...."[4] "The question to be determined is which of the

two contestants possesses a superior right to the [ten percent retained by the government]."[5] "The proceeds of the contract ... became a fund."[6] "The well settled law in respect to the surety on a payment bond under the Miller Act is that ... the same surety becomes subrogated to [the materialmen's] rights to the monies due the defaulting contractor in the hands of the Government."[7] "[I]n all those cases, the owner was a mere stakeholder."[8] The surety has a right to "the total fund remaining in the Government's possession,"[9] and "to the proceeds due a Government contractor...."[10]

■ The inescapable conclusion from these cases is that a surety's remedy is limited to recovery from a fund held by the government/owner pursuant to the construction contract. This is confirmed by an examination of *Balboa Insurance Co.*, 775 F.2d 1158. Despite language in that decision which plaintiff relies on to support its additional theories,[11] the holding is squarely in line with earlier decisions on equitable subrogation. In *Balboa*, the surety had become concerned about the ability of its principal to complete the construction contract. It notified the government that future progress payments should be made to it. Despite the notice, the next progress payment went to the contractor. At issue in the case was whether Balboa could recover the progress payment despite the fact that the money was no longer in the government's possession.

---

2. *Pearlman*, 371 U.S. at 139, 83 S.Ct. at 236; *Prairie State Bank v. United States*, 164 U.S. 227, 231–32, 17 S.Ct. 142, 144, 41 L.Ed. 412 (1896); *Great Am. Ins. Co.*, 202 Ct.Cl. at 550, 481 F.2d at 1308; *United States Fidelity & Guar. Co. v. United States*, 201 Ct.Cl. at 9, 475 F.2d at 1382 (1973).

3. *See, e.g., Martin v. National Sur. Co.*, 300 U.S. 588, 593, 57 S.Ct. 531, 533, 81 L.Ed. 822 (1937); *Home Indemnity Co. v. United States*, 313 F.Supp. 212, 214 (W.D.Mo.1970); *Globe Indem. Co. v. United States*, 84 Ct.Cl. 587, 595 (1937).

4. *Globe*, 84 Ct.Cl. at 595.

5. *Prairie State Bank*, 164 U.S. at 230, 17 S.Ct. at 143.

6. *Martin*, 300 U.S. at 593, 57 S.Ct. at 533.

7. *Home Indem. Co.*, 313 F.Supp. at 214.

8. *United States v. Munsey Trust Co.*, 332 U.S. 234, 240, 67 S.Ct. 1599, 1602, 91 L.Ed. 2022 (1947).

9. *Balboa Ins. Co.*, 775 F.2d at 1163.

10. *Hanover Ins. Co. v. United States*, 279 F.Supp. 851, 853 (S.D.N.Y.1967).

11. See discussion at page 799.

The court rejected defendant's view that the contract balance no longer included monies already paid out:

> [U]pon notification by the surety of the unsatisfied claims of the materialmen, the Government became a stakeholder with respect to the amount not yet expended under the contract that it holds at the time of notification by default.

775 F.2d at 1162. It then quoted with approval the following language: " 'The surety's rights apply to the *total* fund, no matter what it is called, which remains in the hands of the United States ... *at the time notice of default* under its bond is established.' "

*Id.* at 1162–63, *quoting National Surety Corp. v. United States*, 319 F.Supp. 45, 49 (N.D.Ala.1970) (emphasis in original).

Plaintiff asserted in oral argument that the *Balboa* court's reference to a "total fund" available to the surety should be seen as embracing not only agreed upon contractual liabilities but the *right* to convert disputed and thus unknown amounts into liquidated and therefore certain sums. While cognizant that subrogation is a creature of equity, and mindful of the equities in its favor here, the court declines plaintiff's offer to extrapolate *Balboa* so far.

The court in *Balboa* held that recovery is not contingent upon whether monies are still in the government's possession at the time of the surety's claim, so long as the surety notified the government of its interests at a time when monies were still being held. In effect, the government pays out to the contractor at its own risk beyond that point. This is reflected most clearly in the following statement by that court: [U]pon notification by the surety of the unsatisfied claim of the materialmen, the Government became a stakeholder with respect to the amount not yet expended under the contract that it holds at the time of notification of default. 775 F.2d at 1162.

Going beyond this to adopt plaintiff's view that equitable subrogation permits a surety to assert procedural remedies under the construction contract would totally blur the distinction between the surety and the contractor. The surety's agreement is to pay out to the extent of its bonds, the amounts of which are controlled by a contract price negotiated by two other entities. The mechanism for adjusting that contract price is established by the construction contract, and until that mechanism is utilized by the government unilaterally, or by both the government and the contractor, the contract price remains unchanged. The fact that in the government contracts context the "fund" or contract balance can be changed pursuant to the terms of the construction contract after the surety's notification, should not affect the result. As *Pearlman* indicates, plaintiff's right as subrogee amounts to a *security interest in the fund* generated pursuant to the construction contract. It does not give rise to an assignment of the contractor's legal status under that underlying contract. In the absence of a takeover agreement, the two contracts remain separate entities despite the fact that the surety inherits certain rights of the contractor when it performs on its bonds.

■ None of the cases cited by plaintiff suggests the possibility that those rights to a "stake" held by the government extend beyond the amount fixed by the construction contract to include previously unasserted remedies of the contractor. In the absence of clearer precedent, this court will not hold that plaintiff's equitable remedy allows it to seek recovery in this court for damages related to the change orders, the additional excavation cost, and the PCB cleanup. The court concludes, therefore, that with the exception of the $54,371.54 sought as amounts retained because of alleged payroll discrepancies,[12] plaintiff may

---

12. Plaintiff has not argued that this amount should be .treated different than other damages sought under Count I. However, the court is unable, on the present state of the record, to hold that it does not have jurisdiction over this portion of the claim. Although the circumstances surrounding the alleged payroll discrepancies are not clearly set out in the record, if, as it appears, the amount constitutes money withheld by the government from the contract bal-

not recover under Count I on the basis of equitable subrogation.

## B. *Direct Privity of Contract*

█ Plaintiff's primary line of argument goes beyond the concept of subrogation. Its principal contention is that the execution of the bonds, "coupled with its relationship with the UNITED STATES and Kener with respect to the transaction as a whole, created an express or implied contract between plaintiff and the UNITED STATES thus entitling plaintiff to file the instant action either under 28 U.S.C. § 1491 or 41 U.S.C. § 609," citing *Hanover Insurance Co. v. United States*, 279 F.Supp. 851 (S.D.N.Y.) (1967), and *Maryland Casualty Co. v. United States*, 100 Ct.Cl. 513, 53 F.Supp. 436 (1944). Plaintiff's Opposition to Defendant's Motion for a Partial Summary Judgment 6. Plaintiff argues that this hybrid theory is a logical extension and blending of surety and government contracts law. While plaintiff's argument is not without support, upon close inspection, it is crafted by splicing statements from decisions which are clearly limited to the traditional subrogation remedies of a surety.

Plaintiff's primary reliance is placed on *Balboa*. There the court stated that "a surety, as the bondholder, is as much a party to the Government contract as the contractor. If the *surety* fails to perform, the government can sue it on the bonds." 775 F.2d at 1160 (emphasis in original). Moreover, the decision contains the statement that

> [a]lthough it is conceivable that under certain circumstances a surety could assert rights against the Government under the third-party beneficiary rule, or even as one in privity in contract with the Government, the traditional means of asserting a surety's claim is under the equitable doctrine of subrogation.

*Balboa*, 775 F.2d at 1160–61 (citations omitted). The court also refers to *Martin v. National Surety Co.*, 300 U.S. 588, 598, 57

ance, plaintiff's right to attempt in this court to prove entitlement to any retainage appears well

S.Ct. 531, 535, 81 L.Ed. 822 (1937), for the proposition that the "terms of the bond are read into the contract," 775 F.2d at 1161, while plaintiff also points to *Hanover Insurance Co.* for the proposition that "the surety agreement is tri-partite; in this case the [government] was the obligee—the one to whom the obligation runs." 279 F.Supp. at 852.

Plaintiff's argument is correct to this extent: the courts have clearly given the surety standing to directly sue the government/owner. While the government typically would not be a signatory to the surety agreement, it is clearly the primary beneficiary of the surety's obligation and it would be inequitable to allow it to retain monies which it has previously agreed to pay for the work done. To the extent that the surety incurs losses to insure that completion, it has been allowed to recover them from the government, which is recipient of the work and materials.

Plaintiff is unable to point to any decisions, however, nor has the court discovered any, in which a surety in plaintiff's position was permitted to step into the shoes of the contractor for the purpose of making changes in the construction contract price. All the cases it points to are limited by the facts and specific holdings to situations in which the surety is making a claim against a "contract balance."

The precise question presented here was recognized but not decided in *Carchia v. United States*, 202 Ct.Cl. 723, 485 F.2d 622 (1973). There, the Court of Claims allowed a *completing* surety to claim payment for extra work beyond that contemplated in the original contract price. The government argued that its obligation was limited to the balance owed on the contract. The court rejected that view but limited its holding to circumstances in which there is a takeover agreement between the government and the surety:

> Whatever may be the rule if the surety had not finished the work by agree-

established. *See, e.g., United States Fid. & Guar. Co.*, 92 Ct.Cl. at 152–53.

*ment with the United States, that is not the situation here.* After the wrongful default termination, the contracting officer called upon Aetna to complete the remainder of the work. Pursuant to a written agreement between the surety and the contracting officer, based upon that officer's decision that the plaintiff was in default, the balance of the work, including extras, was fully performed by the surety company, through another contractor, by about November 1, 1962. 202 Ct.Cl. at 735–36, 485 F.2d at 628–29 (emphasis added).

*Carchia* and other similar cases are therefore factually distinct from the case at bar in one critical respect: there were separate takeover agreements between the government and the surety after default by the contractor. In that circumstance, the surety in effect becomes the contractor, subject to the terms of the new agreement. *See, e.g., Transamerica Insurance Co. v. United States,* 6 Cl.Ct. 367 (1984); *Morrison Assurance Co. v. United States,* 3 Cl.Ct. 626 (1983). Since plaintiff has not alleged in any of its pleadings that there was either an express or implied takeover agreement,[13] it may not recover under that line of cases.

The court therefore concludes that the privity of contract previously recognized in the case law is limited, in the case of a non-completing surety, to traditional equitable relief—namely, for losses incurred by the surety on its bonds to the extent of the contract balance held by the government/owner.

## C. *The Contract Disputes Act*

■ The final twist plaintiff puts on its argument is that it is a "contractor" within the meaning of the CDA since that term is defined as "a party to a Government contract other than the Government." 41 U.S.C. § 609(a). At oral argument plaintiff's counsel joined this definition with the

statement in *Martin* that the terms of the bond are "read into the contract," 300 U.S. at 598, 57 S.Ct. at 535, to conclude that plaintiff's surety contract subsumes the construction contract and that it therefore has standing under the CDA.

Initially, the court would observe that the purpose of the CDA was to provide a comprehensive, centralized system for adjudicating contract claims against the government. *McDonnell Douglas Corp. v. United States,* 754 F.2d 365 (Fed.Cir.1985); *Prefab Products, Inc. v. United States Postal Service,* 600 F.Supp. 89 (S.D.Fla. 1984). This is made clear in the legislative history of the CDA with respect to the definition of the term "contractor." The Senate Report discusses the need for a single point of contact with the contracting officer in order to highlight the risk of allowing direct claims by subcontractors. S.Rep. No. 1118, 95th Cong.2d Sess. 16, *reprinted in* 1978 U.S.Code Cong. & Ad. News 5235, 5250. The same analysis would apply in the case of sureties. Under plaintiff's theory, the contracting officer could be faced with claims going to the substance of the underlying contract by both the contractor and the surety. While sureties are not subject to the same limitations on privity of contract as are subcontractors, *Balboa,* 775 F.2d at 1160, that privity has been extended only to the *surety* contract, not the construction contract. The court concludes, therefore, that plaintiff is not a party to the construction contract, and therefore not a "contractor" under CDA.

■ Even if plaintiff were entitled to pursue Count I under the CDA, the court would also have to find that it may not do so at this time. On March 23, 1984, plaintiff submitted a claim to the contracting officer for the entire amount requested in the instant action.[14] There is no genuine issue that the claim failed to comply with

---

13. *See supra* note 1.

14. On June 28, 1984, the Corps of Engineers issued a decision declining to accept the claim.

Thus, no contracting officer's decision on the merits of the claim has been issued.

41 U.S.C. § 605(c)(1), which provides, in part, that

> For claims of more than $50,000, the contractor shall certify that the claim is made in good faith, that the supporting data are accurate and complete to the best of his knowledge and belief, and that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable.

Plaintiff asserts, however, that it stated that its claim was true, so that the interest the government has in assuring that claims are certified to be accurate and not fraudulent has been satisfied. The court cannot agree. The proper certification of a claim for the contracting officer is a jurisdictional prerequisite to review by the court under 41 U.S.C. § 609(a)(1). *W.M. Schlosser Co. v. United States*, 705 F.2d 1336 (Fed.Cir. 1983); *Skelly & Loy v. United States*, 231 Ct.Cl. 370, 685 F.2d 414 (1982); *Fredenburg v. United States*, 10 Cl.Ct. 216 (1986). Absent such certification, the court may not hear the claim. *W.H. Moseley Co. v. United States*, 230 Ct.Cl. 405, 677 F.2d 850 (1982). Thus, defendant is entitled to judgment on this issue as a matter of law.

## CONCLUSION

For the reasons stated above, defendant's motion for summary judgment is granted in part and denied in part. With the exception of the claim for $54,371.54, Count I of the complaint is dismissed. The parties are directed to file a Joint Preliminary Status Report on or before October 24, 1986, with respect to Count II and the single portion of Count I which remains.

IT IS SO ORDERED.