TRANSAMERICA INSURANCE COMPANY, Plaintiff–Appellant,

v.

The UNITED STATES, Defendant–Appellee.

No. 91–5099.

United States Court of Appeals, Federal Circuit.

March 24, 1993.

John V. Burch, P.C., Bovis, Kyle & Burch, Atlanta, GA, argued for plaintiff-appellant.

Edward G. Gallagher, Wickwire Gavin, P.C. Washington, DC, argued for amicus curiae, American Ins. Ass'n.

Richard E. Rice, Atty., Commercial Litigation Branch, Dept. of Justice, Washington, DC, argued for defendant-appellee. With him on the brief were Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director and Terrence S. Hartman, Asst. Director. Also on the brief was Reeves Lewis, Trial Atty., U.S. Army Corps of Engineers, of counsel.

Before PLAGER, LOURIE and RADER, Circuit Judges.

PLAGER, Circuit Judge.

Plaintiff Transamerica Insurance Company (Transamerica) was the performance bond surety on two construction contracts with defendant United States (United States or government), the second of which was defaulted on by the contractor. Transamerica sued the government, under the doctrine of equitable subrogation, for recovery of funds payable by the government to the contractor under an equitable adjustment to the first contract, which the contractor sought and obtained after completing the first contract. The funds were sought as mitigation of Transamerica's losses incurred when it took over and completed performance of the second contract. The Court of Federal Claims[1] granted the motion of the government for judgment on the pleadings, and dismissed Transamerica's complaint.[2] We reverse and remand for further proceedings.

## BACKGROUND

The United States, through the U.S. Army Corps of Engineers, entered into two separate contracts with the Bodenhamer Building Corporation (Bodenhamer), both regarding construction at Fort Bragg, North Carolina. Contract No. DACA-21-85-C-0104 (the 0104 contract) was for construction of the Commissary Warehouse and Class VI Store—it will be referred to hereafter as the Commissary contract—and Contract No. DACA-2187-C-0054 (the 0054 contract) was for construction of the Bowley Elementary School—hereafter the School contract. Transamerica, a surety bond company, issued payment and performance bonds for both of the contracts on behalf of Bodenhamer for the benefit of the government.

Bodenhamer defaulted on the School contract. Transamerica, pursuant to its obligations as surety, took over and completed the construction of the elementary school by obtaining a replacement contractor. Transamerica claims that it incurred over $1,000,000 in losses while undertaking its obligations under this performance bond.

Bodenhamer apparently completed its work under the Commissary contract, and filed a claim with the Corps of Engineers for equitable adjustment in an amount exceeding $500,000. Transamerica, having closely monitored Bodenhamer's progress on its claim for adjustment, sought the funds owed by the government to Bodenhamer pursuant to the settlement reached on the claim. Transamerica claims that it gave written notice to the government that it sought under the doctrine of equitable subrogation the funds owed Bodenhamer. However, the government disbursed the funds to Bodenhamer.

Transamerica sued the government in the Court of Federal Claims, arguing that it had been damaged by the government's disregard of Transamerica's right of equitable subrogation. Transamerica argued that it was therefore entitled to damages from the government.

The government moved to dismiss Transamerica's claim for lack of jurisdiction and for failure to state a claim upon which

---

1. The United States Claims Court was renamed as the Court of Federal Claims effective October 29, 1992. *See* Federal Courts Administration Act of 1992, Pub.L. No. 102–572, § 902(a), 106 Stat. 4506, 4516 (1992).

2. 22 Cl.Ct. 674 (1991).

relief may be granted. The Court of Federal Claims concluded it had jurisdiction; that issue is not appealed here and need not be further addressed. However, once the court reached the merits of Transamerica's argument, it concluded that "Transamerica as performance bond surety on Contract 0054 [the School contract] is unable to recover funds the government owed to Bodenhamer on Contract 0104 [the Commissary contract]." 22 Cl.Ct. at 677.

The Court of Federal Claims thus rejected Transamerica's argument that it was entitled to set off its losses incurred under the School contract against funds owed to Bodenhamer under the Commissary contract. Transamerica had argued that, because the government could have set off any losses it incurred through completion of the School contract against funds it owed to the contractor under the Commissary contract, Transamerica could, under equitable subrogation, step into the government's shoes and set off the losses it incurred through completion of the same contract against these same funds. In coming to its conclusion, the Court of Federal Claims relied largely on *Dependable Ins. Co. v. United States,* 846 F.2d 65 (Fed.Cir. 1988), and the authorities cited therein, *viz., Security Ins. Co. v. United States,* 428 F.2d 838, 192 Ct.Cl. 754 (1970); *Ram Constr. Co. v. American States Ins. Co.,* 749 F.2d 1049 (3d Cir.1984); *Western Casualty & Sur. Co. v. Brooks,* 362 F.2d 486 (4th Cir.1966); *Balboa Ins. Co. v. United States,* 775 F.2d 1158 (Fed.Cir.1985); and *Universal Sur. Co. v. United States,* 10 Cl.Ct. 794 (1986). The Court of Federal Claims reasoned that these authorities stand for the proposition that a "surety's rights and remedies are limited to recovery of retained funds from the contract generating the claim," *id.* at 677 (citing *Dependable,* 846 F.2d at 67), and that this result is not changed just because the surety enters into a number of construction bonds with the same contractor. *Id.* Therefore, Transamerica could not set off its losses against the funds owed to Bodenhamer because those losses arose out of a different contract. *Id.*

Transamerica appealed here, challenging the Court of Federal Claims' decision. Transamerica argues, as it did before the Court of Federal Claims, that the instant action is distinguishable from, and warrants a different result than that in, *Dependable* and the cases cited therein. In Transamerica's view, *Dependable* involved a situation in which the government had a competing claim to the funds at issue; the use of those funds to offset the surety's losses would have preempted the government's competing claim. Here, since the government has no such competing claim that could be preempted, Transamerica should be able to offset through equitable subrogation its losses against these funds.

Transamerica points out that this result provides an incentive for a surety to complete a project, as usually preferred by the government, because the surety is not made any worse off than the surety would have been had the government chosen to complete the project itself. Any loss is most efficiently, and most fairly, shifted to the defaulting contractor, who is really the party responsible for the loss.

In support of its position, Transamerica cites us to *District of Columbia v. Aetna Ins. Co.,* 462 A.2d 428 (D.C.Ct.App.1983). That case concerned a performance bond surety for two public works projects with the District of Columbia government involving the same contractor. 462 A.2d at 429. Upon default by the contractor on one of the projects, the surety completed the project and then sought to recover through equitable subrogation funds arising from the other project which the contractor completed. As in the present situation, the surety in *District of Columbia* gave written notice to the District asserting its rights to the funds owed the contractor by the District on the contractor-completed contract. The surety and the contractor were the only claimants for the retained funds; the District was only a stakeholder. Nevertheless, the district later disbursed the funds to the contractor.

The surety in *District of Columbia* sued the District, arguing that it was subrogated to the rights of the District to offset its

loss against the profit on the second contract. The Court of Appeals held that

> where, as here, the only claimants to monies held by a government agency are the surety and a defaulting contractor, the surety who has performed under a public works performance bond agreement, upon full satisfaction of its surety obligation, is subrogated to all of the rights and remedies which the government might have had against the principal had the government been forced to complete the project itself. Among these remedies is the common law right of setoff.
>
> .    .    .    .    .
>
> In the present situation, the District had notice of both the facts giving rise to an equitable right in Aetna, and Aetna's claim under these rights as manifested in the letters.... We have found no limitations upon the right of subrogation which would justify the District's actions in this instance.
>
> ... [W]e do not suggest that the District of Columbia must or should engage in an interpleader action in each of its many construction projects. Rather, we simply hold that in the absence of other competing parties where a surety gives a reasonable written notice of a claim adverse to that of a defaulting contractor for whom it has performed its bond, prudent use of the interpleader process may assist the District in resolving the dispute rather than burden it.

462 A.2d at 432 (footnote omitted).

A brief on appeal was also filed in this case by the American Insurance Association (AIA), as *Amicus Curiae,* supporting Transamerica's position. AIA argues that, under general surety law, Transamerica is subrogated to whatever rights the government could have asserted against Bodenhamer had the government completed the School contract. The government could have offset any losses it might have incurred had it completed the School contract itself against the funds it owed Bodenhamer under the Commissary contract. Therefore, as the completing surety and under the doctrine of equitable subrogation,

Transamerica should have access to the same offset.

The government argues that the Court of Federal Claims correctly interpreted and relied on *Dependable. Dependable,* argues the government, stands for the proposition that a surety cannot through the doctrine of equitable subrogation recover funds held by the government under any contract other than that contract which generated the surety's claim. Therefore, the purported distinction asserted by Transamerica—the lack of a competing claim by the government—is irrelevant. Regarding Transamerica's reference to *District of Columbia,* the government merely argues that *Dependable* rather than *District of Columbia* is controlling law in this court.

### DISCUSSION

Whether Transamerica states a claim upon which relief may be granted is a question of law, which this court of course reviews *de novo.* We will look first to the surety law cases, and then to the equities involved in the present action.

#### Surety Law

Only one case has been cited to us, and we find no other, that squarely addresses the present situation—*District of Columbia v. Aetna.* That case presented a surety who completed the obligations of a contract on behalf of a defaulting contractor and then claimed the right to funds owed by the government (in that case, of the District of Columbia, rather than the United States) to the defaulting contractor on a separate contract.

As in the present case, the government in *District of Columbia* had no claim to the retained funds. In *District of Columbia,* summary judgment was entered for the surety on the question of whether it was subrogated to the right to offset the loss on the one contract against the funds owed on the second contract. The Court of Appeals affirmed, as discussed above. That court distinguished its holding from cases in which there were competing equities to be weighed regarding the entitle-

ment to the funds at issue. 462 A.2d at 431–32.

The *District of Columbia* court refuted the District's argument that the right to subrogate is restricted to agreements for which either there is contractual privity between the surety and the obligee (in that case, the District), or, absent privity, for which the surety is a party. *Id.* at 431. The court instead relied on the equitable nature of the right of subrogation:

> Fairness would dictate that the surety be accorded the owner's rights and remedies with respect to the contractor. In circumstances, like the present, where the same contractor is engaged in more than one project, it becomes clearer that it is the reach or scope of the remedy rather than the equitable right itself which is at issue. Finding no persuasive reasons to the contrary, we adopt the view that, "[t]he right of subrogation is not founded on contract. It is a creature of equity; is enforced solely for the purpose of accomplishing the ends of substantial justice; and is independent of any contractual relations between the parties." *Memphis L.R.R. Co. v. Dow*, 120 U.S. 287, 301–02, 7 S.Ct. 482, 488–89, 30 L.Ed. 595 (1887); *see City Stores Company v. Lerner Shops of District of Columbia, Inc.*, 133 U.S.App.D.C. 311, 410 F.2d 1010 (1969); G. HARRIS, A TREATISE ON THE LAW OF SUBROGATION 123–24 (1889); H. SHELDON, [LAW OF SUBROGATION] at 2, 10, 107–08 [1882].

462 A.2d at 431.

*Dependable Insurance Co. v. United States, supra,* is not to the contrary. In *Dependable*, the surety was not claiming rights to funds in which the government was simply a stakeholder, but instead it was competing with the government's own claim to the funds. The money the government as employer owed the contractor on the second contract was being claimed by the government as tax collector. With the surety competing with the government for the funds, this court held the surety could not avail itself of the doctrine of subrogation to give itself priority over the government's own claim to the funds.

An examination of the cases relied on in *Dependable* demonstrates the limits on the holding in that case. In *Security Insurance,* the Court of Claims did state that the surety on two projects was not entitled to recover amounts expended on one contract from money retained by the government on the other contract. However, in this case too, the government had a competing claim to the retained funds from the other contract due to unpaid taxes by the contractor. Further, in holding that the surety could offset its losses on the latter contract against these retained funds notwithstanding the government's competing claim, the Court of Claims stated that this result

> avoids the anomalous result whereby the performance bond surety, if setoff [by the government on its tax claim] were permitted, would frequently be worse off for having undertaken to complete performance. As the Supreme Court noted in *[United States v.] Munsey [Trust Co.,* 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947) ], "a surety would rarely undertake to complete a job if it incurred the risk that by completing it might lose more than if it had allowed the government to proceed." 332 U.S. at 244 [67 S.Ct. at 1604].... *See Trinity [Universal Insurance Co. v. United States], supra,* 382 F.2d [317] at 321 [ (5th Cir. 1967) ]. We do not think that in enacting the Miller Act, [which requires contractors on federal construction projects to furnish payment and performance bonds with sureties] the Congress intended such a result.

428 F.2d at 844. It is this paragraph, rather than the language relied on by the government, which gives more guidance as to how the Court of Claims might have intended its holding to be interpreted for application to the present situation.

In *Ram Construction,* the Court of Appeals for the Third Circuit was faced with a surety who tried to claim subrogation of the city's right to set off its loss on a first, pre-bankruptcy contract with the expected profits from a later, post-bankruptcy contract. The Court of Appeals referred to *Western Casualty* for the proposition that

the right of subrogation extended only to the particular project on which the surety had made payments. 749 F.2d at 1055.

However, that court also noted that "there is another reason why [the surety] cannot prevail here. Because [the second contract] was a separate contract entered into after the filing of the petition in bankruptcy, the City would have no right to set off claims under pre-petition contracts against profits created by a post-petition agreement." 749 F.2d at 1055. Thus, it is clear that the court's statement—that the surety's subrogation rights extend only to the particular project on which the surety had made payments—was purely dictum. As the *Ram Construction* court noted, " '[i]t is elementary that one cannot acquire by subrogation' from another, rights which that person did not have." *Id.* (quoting *Munsey Trust, supra,* 332 U.S. at 242, 67 S.Ct. at 1603). In that case, the city had no setoff rights to the profits from the second contract because it was a post-bankruptcy contract; therefore, the surety had no subrogation rights to these profits.

In *Western Casualty,* cited in *Ram Construction,* the Court of Appeals for the Fourth Circuit faced a situation in which the surety on two contracts sought to set off the loss incurred in completion of one contract (i.e., paying debts owed to certain laborers and materialmen by the bankrupt contractor) with the profit from the other. The government involved, the State of Ohio, did not have any stake in the retained funds.

However, that case is distinguishable since the surety through payment of the debts involved only became subrogated to the rights of the laborers and materialmen who were paid, rather than the rights of the state. *Id.* at 491. Moreover, even assuming that the surety somehow became subrogated to the rights of the state, under an Ohio statute permitting unpaid laborers and materialmen to recover from the state but only to the extent of the contract balance owing to the contractor, the state, had it completed the first contract, *could not* have any setoff rights akin to those claimed by the surety. Pursuant to the referenced statute, Ohio had no obligation to insure that the laborers and materialmen were paid *in excess of the retained funds on each contract.* Thus, the state could not be required to incur a 'loss' on the first contract; there could be no involuntary debt to set off against the profit on the second contract. The state would never be in a position where it would have the right to offset a loss against the profits of the second contract in the way that the surety wanted to do. The result was that the surety wanted to subrogate itself to rights of the state that did not exist. 362 F.2d at 492.

In *Balboa Insurance,* the funds at issue were simply the government's progress payments made to the contractor on the same contract which gave rise to the surety's interest in the funds. The government continued to make progress payments to the contractor, despite having been notified by the surety that the contractor appeared to be unable to fulfill its obligations under the contract and that further progress payments should not be made without the surety's consent. In that situation, the surety was found by this court to be entitled to assert rights against the government for breaching its obligations to the surety. 775 F.2d at 1163–65 (the Court of Federal Claims' grant of summary judgment on behalf of the government was vacated, and the case was remanded for further proceedings).

In *Universal Surety,* the surety brought an action in the Court of Federal Claims against the government. The surety, after fulfilling its obligations (under performance or payment bonds or both) when the contractor became financially unstable, tried to claim not only funds retained by the government from the contract price, but also additional expenses from the government in excess of the contract price. However, there was no written agreement allowing the surety to take over the project, and the contractor in fact stayed on the job and completed its work. *Id.* at 795. Moreover, the contractor never sought an adjustment to the contract price for the additional expenses incurred by the surety. The Court of Federal Claims held that the

surety was entitled to the contract funds retained by the government, but that, absent a claim by the contractor for an adjustment to the contract price, the surety was not entitled to subrogation of the right of the contractor to seek an adjustment to the contract price for extra expenses incurred. 10 Cl.Ct. at 798–99.

The government characterizes both *Balboa Insurance* and *Universal Surety* as "stand[ing] for the proposition that a surety's rights under the doctrine of equitable subrogation are limited to recovery of funds retained on the bonded contract alone." However, it is clear from the facts of those cases that, although the literal wording of the courts' holdings might support the government's position, examination of the facts in each case make it clear that the courts were not faced with a situation similar to that here.

The general rule is that "a surety who pays the debt of another is entitled to all the rights of the person he paid to enforce his right to be reimbursed." *E.g., Pearlman v. Reliance Ins. Co.,* 371 U.S. 132, 137, 83 S.Ct. 232, 235, 9 L.Ed.2d 190 (1962). The only case referred to us with facts similar to these, and which is fully consistent with this rule, is *District of Columbia.* On the facts before us, we find nothing in the law of suretyship to cause us to favor allowing Bodenhamer, the defaulting contractor, to be better off simply because the surety, rather than the government, completed a contract and thereby incurred damages.

None of the other cases cited had the same balance of equities at hand. Each time, another interest beside that of the contractor took priority over the surety's claim. In *Dependable,* for example, the government had a countervailing tax claim against the retained funds sought by the surety; the surety unsuccessfully sought priority over the government interest.

In each of these other cases, it is certainly true that the surety's equitable right to subrogation should be counterbalanced by the other interests involved. It is 'equitable' in those situations to give the surety top priority only over funds related to the contract it completed. However, as in *District of Columbia,* there are no other interests involved here, except for the defaulting contractor. The courts in these other cases did not need to fully consider the situation presented here—when there is only one other claimant for the defaulting contractor's funds.

### The Equities

Unlike much of government contract law, the doctrine of equitable subrogation finds its roots not in statutory law but in the judicial commitment to providing fairness and equity among competing claimants. The equities here strongly support Transamerica's position. Had the government chosen to itself complete the work on the School contract, and had it incurred any losses or extra expense in so doing, it clearly would have had the option to set off its claim against the monies it owed Bodenhamer on the Commissary contract. Further, it could have later sought any remaining deficiencies from Transamerica. We see no reason to allow Bodenhamer to profit, at Transamerica's expense, from the government's choice to have Transamerica complete the work. And we see no reason to harm Transamerica simply because of that same choice.

The government suggests that allowing Transamerica to succeed here will burden the government with a large number of situations in which the government would find itself to be a stakeholder, such as it did here. However, there is no evidence in the record to support this parade of the horribles. As *District of Columbia* suggests, the government could avail itself of an interpleader action when it is deemed appropriate or necessary.

There is language in *Dependable* that seems to state the limits on subrogation as broadly as the government contends. That the government in good faith believed that that was the controlling principle is not the same as a conclusion that the equities favor the government. In situations such as *Dependable* it is equitable to protect the government's own claim to the fund, and to

counterbalance the surety's equitable right to subrogation by the other interests involved. On the facts of this case, when there are no government claims to be counterbalanced, it would be against fairness and good conscience to allow the defaulting contractor to benefit, through the government's error, at the expense of the fully performing surety.

## CONCLUSION

We reverse the Court of Federal Claims' decision granting the government's motion to dismiss for failure to state a claim upon which relief may be granted. We remand for further proceedings consistent with this opinion.

REVERSED and REMANDED.