### THE HOME INSURANCE COMPANY, Plaintiff,

v.

### The UNITED STATES, Defendant.

### No. 95–724C.

United States Court of Federal Claims.

March 9, 2000.

Robert B. Wedge, Atlanta, Georgia, for plaintiff. Mary L. Hahn, of counsel.

Brian S. Smith, with whom were Assistant Attorney General Frank W. Hunger, David M. Cohen, and Kirk Manhardt, Washington, D.C., for defendant.

## OPINION

BRUGGINK, Judge.

This action is brought by a performance bond surety against the United States acting through NASA, as owner of a construction project at Cape Kennedy. Pending are the parties' cross motions for summary judgment. In broad terms, the question presented is what plaintiff's rights are, as surety, to the contract balance. Oral argument was held, and additional submissions solicited. The matter is now fully briefed.

### FACTUAL BACKGROUND

NASA entered into a contract with International Steel Industries, Inc. (ISI) for the construction of a piping system at its vehicle assembly building at Cape Kennedy, Florida. The Home Insurance Company executed performance and payment bonds naming ISI as principal in favor of NASA. ISI became financially unable to perform the contract, so plaintiff established an account with Nationsbank upon which Home Insurance would draw for funds to complete the project.

In May of 1994, ISI directed NASA by letter to forward all future payments pertaining to the contract to the Nationsbank account. NASA acknowledged receiving this letter and agreed to make payments accordingly. Home Insurance took control over ISI's performance duties, arranging for a completing contractor and for paying off materialmen and suppliers. In a June 7, 1994 letter to NASA, Home Insurance indicated that it had "arranged for Canaveral Construction Corporation to act as our complet-

ing contractor." It also wrote that it looked "forward to promptly entering into a 'Take–Over' agreement with NASA." In that letter and in a subsequent letter dated August 29, 1994, the surety reminded NASA to make payments to the Nationsbank account.

The parties began negotiations for a formal takeover by Home Insurance through a new contract with NASA. Discussions were held and draft agreements were exchanged. Troward Wells, Bond Claim Manager for Home Insurance, recites in his affidavit that

> At a meeting among representatives of NASA, the Home and ISI on May 25, 1994, the parties agreed that NASA and the Home would enter into a Takeover Agreement. At that meeting, Quinton W. Worthy, Chief of Construction of NASA, provided [me] with the form of a proposed Takeover Agreement [ ] to complete.

It can be assumed for purposes of ruling on the motion that NASA officials were aware that Canaveral was doing the completion work for Home Insurance. It is undisputed, however, that Canaveral finished the work with no signed agreement in place.

NASA made certain payments to the Nationsbank account. It is now undisputed that these payments total $720,952.00.[1] It also undisputed that in February 1995, contrary to the notice, NASA improperly directed two payments, totaling $72,310.00, to ISI's separate account. NASA unsuccessfully attempted to recoup those payments, securing, in the process, an indictment of ISI's President for theft. NASA subsequently made payments directly to the Nationsbank account.

There is no evidence that Home Insurance incurred more than $582,919 in expenses in completing the obligations of ISI and in satisfying its own obligations on its performance and payment bonds.[2]

**DISCUSSION**

Plaintiff presents two theories in support of its claim. The first is that it entered into a new contract with NASA, entitling it to the entire contract balance, irrespective of what it expended to complete performance. Alternatively, it argues that, under the principle of equitable subrogation, it is entitled to recover any amount paid erroneously after NASA was on notice that payments should go to it as surety, once again, irrespective of whether it incurred costs in excess of what it was reimbursed.

The law of suretyship and the rights of private entities to sue the United States are not perfectly meshed. This circuit has struggled to define those rights in a way which is consistent with notions of privity and sovereign immunity. Insofar as the present facts make relevant, we consider that the law permits a recovery under one of two circumstances. First, if the surety enters into a new contract with the government, then privity is created, direct suit is possible, and recovery is permissible consistent with the terms of that new contract. Second, the surety can have rights against the government if the government, after notice by the surety or the contractor that future payments should be made directly to the surety, nevertheless makes payments to the contractor. The latter type of action, denominated "equitable subrogation," is permitted despite the lack of any direct privity between the surety and the government.

The facts supporting the second possible theory are uncontested. NASA received notice and should not have made the two contested payments to ISI. It nevertheless did so. The real question is the legal effect of those payments, more specifically, whether the right of recovery depends on a theory of restitution for actual expenditures, as the government contends.

---

1. This issue initially was open to some question. In its supplemental proposed findings of fact, defendant alleges, with supporting documentation, that "Home received, via payments to is Nationsbank account, a total [of] $720,952 for this project." Plaintiff declined the opportunity to contest this finding. It is therefore deemed admitted.

2. There was also some question initially as to whether this government assertion was disputed. Defendant's most recent supplement to the proposed findings of fact in this respect was not answered.

■ The Restatement (Third) of Suretyship is instructive with respect to general principles governing the rights and responsibilities of the various parties. The first is that, upon satisfying its obligations to the owner by performing the contractor's obligations for it, the surety (Home) is subrogated to all of the owner's (NASA's) rights against the contractor (ISI) as a way to secure reimbursement. *See* Restatement (Third) of Suretyship § 27. *See also Transamerica Ins. Co. v. United States,* 989 F.2d 1188, 1194, *reh'g denied* 998 F.2d 972 (Fed. Cir.1993). Under the principal contract, the owner is entitled to performance from the contractor. Home Insurance is therefore entitled to insist on performance, or the equivalent of it, from ISI. This means that the surety, after meeting its obligations under its bonds, is entitled to reimbursement from the contractor for costs incurred in satisfying those obligations. *See id.* § 22. The equivalent of the contractor's performance, of course, is the contract balance. The contract balance, therefore, becomes security for the surety's right to reimbursement from the contractor. *See id.* § 27, ill. 3. To the extent the owner is on notice that the surety will look to the contract balance as such a security, an "equitable subrogation" is created. Thereafter, if the owner impairs that security by, for example, paying it over to the contractor after notice, the surety has a cause of action against the owner. *See Washington Int'l Ins. Co. v. United States,* 16 Cl.Ct. 663, 666, *aff'd* 889 F.2d 1101 (Fed. Cir.1989).

An early statement of the law of equitable subrogation is useful:

'The law upon this subject seems to be, the reserved per cent to be withheld until the completion of the work to be done is as much for the indemnity of him who may be a guarantor of the performance of the contract as for him for whom it is to be performed.... Equitably, therefore, the sureties in such cases are entitled to have the sum agreed upon held as a fund out of which they may be indemnified, and if the principal releases it without their consent it discharges them from their undertaking. The principle is, the withdrawal of the fund agreed upon as security for performance of

the contract without his consent is a prejudice to the surety or guarantor.'

*Prairie State National Bank v. United States,* 164 U.S. 227, 239, 32 Ct.Cl. 614, 17 S.Ct. 142, 41 L.Ed. 412 (1896), (*quoting with approval Finney v. Condon,* 86 Ill. 78, 80–81 (1877)). *See also United States v. Munsey Trust Co.,* 332 U.S. 234, 242, 108 Ct.Cl. 765, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947); *Globe Indemnity Co. v. United States,* 84 Ct.Cl. 587, 595 (1937).

■ In other words, the rights of the performing surety are primarily against the contractor (as primary obligor). Its affirmative rights against the owner are not contractual in nature, *see Memphis & L.R.R. v. Dow,* 120 U.S. 287, 301–02, 7 S.Ct. 482, 30 L.Ed. 595 (1887); Restatement § 27 cmt. a, but are limited to the recovery from the owner of the collateral, to the extent it is equitably secured.

■ If that is the case, as we believe it to be, the result is unfavorable for plaintiff here. Its claim against the contract balance is in substitution for its claim against the contractor. That claim is limited to one for restitution of its investment in performance. Its claim against the owner is limited to one for impairment of its security. The overlap of these limitations dictates that Home Insurance has no claim against the government, because, even though its security was jeopardized by the mispayments, those mispayments caused it no injury in fact. Having been paid more that it spent, Home Insurance received all that it could have recovered from ISI. It cannot have a larger claim against the government as owner. The monies held by the United States, in other words, are, in a sense, fungible. So long as the United States kept sufficient funds to satisfy Home Insurance's right to recover its expenses, the surety was not injured and has no further claim.

This result is consistent with the Supreme Court's teaching in *Pearlman v. Reliance Ins. Co.,* 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962). Although that case resolved a question of priority between the trustee in bankruptcy of the contractor and the surety, the rights recognized in the sure-

ty were bracketed by the degree of its investment in performance:

> We therefore hold in accord with the established legal principles stated above that the Government had a right to use the retained fund to pay laborers and materialmen; ... that the contractor, had he completed the job and paid his laborers and materialmen, would have become entitled to the fund; and that the surety, having paid the laborers and materialmen, is entitled to the benefit of all these rights to the extent necessary to reimburse it.

*Id.* at 141, 83 S.Ct. 232.

The alternative theory of recovery—the existence of a separate takeover agreement—obviates the limitations of surety law. *See Carchia v. United States,* 202 Ct.Cl. 723, 485 F.2d 622, 628–29 (1973). Plaintiff contends that it entered into a takeover agreement with NASA, and, hence has privity. The terms of that agreement, according to Home Insurance, are that it is entitled to the contract balance.

The problem with this argument is that it lacks the necessary factual predicate-i.e., the formation of a contract. It is uncontested that there was no signed takeover agreement. Home Insurance signed a final draft, but NASA did not. Ironically, if NASA had signed the proposed agreement, plaintiff would have no argument to make. The draft contract contained obligatory language to the effect that "In no event shall SURETY be entitled to be paid any amount in excess of its total expenditures necessarily made in completing the work ..." This language was lifted from 48 C.F.R. § 49.404(e), which controls takeover agreements in construction contracts prompted by contractor default.[3] It states:

> The agreement shall provide for the surety to complete the work according to all the terms and conditions of the contract and for the Government to pay the surety the balance of the contract price unpaid at the time of default, but not in excess of the surety's costs and expenses.

48 C.F.R. § 49.404(e) (1993).

While the argument might be made that valid takeover agreements could be negotiated without this ceiling on payment,[4] that argument is not made here. The only potential agreement offered by the plaintiff contains the limitation. The plaintiff apparently did not agree to anything else. Even assuming the government's conduct or words could be cobbled into an implied in fact takeover contract, there is no suggestion that the parties agreed that Home Insurance would earn the remaining balance, even in excess of expenditures.

Accordingly, plaintiff's motion for summary judgment is denied. Defendant's motion for summary judgment is granted. The clerk is directed to dismiss the complaint, with prejudice. Each side shall bear its own costs.

---

3. The factual recitations do no indicate whether ISI had been formally default terminated. In any event, a takeover agreement could not have occurred absent termination. *See* 48 C.F.R. § 49.404(d) (1995).

4. Plaintiff would have to cope with the rule announced in *G.L. Christian and Assoc. v. United States,* 160 Ct.Cl. 1, 312 F.2d 418 (1963), that certain "deeply engrained strand[s] of public procurement policy" are "read into" government contracts. *See General Eng'g & Machine Works v. O'Keefe,* 991 F.2d 775, 779 (Fed.Cir.1993).