TRAVELERS INDEMNITY COMPANY, et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 495–85C.

United States Claims Court.

Dec. 28, 1988.

---

**144**

F. Philip Kirwan, Kansas City, Mo., attorney of record, for plaintiffs.

Katherine A. Day, Washington, D.C., with whom was Asst. Atty. Gen. John R. Bolton, for defendant.

## OPINION

REGINALD W. GIBSON, Judge:

*Introduction*

Plaintiffs, Travelers Indemnity Co., et al. (Travelers), a Connecticut assignee surety in the business of issuing surety bonds for construction contracts, brings this action for $5,646,113.14 against the United States (government or defendant). The claim, consisting of eight (8) counts, is based upon an alleged breach of a payment bond, a surety bond, a construction contract, and a Takeover Agreement by making improper payments to the prime contractor, Macomb Contracting Corporation.

Jurisdiction in this court is premised upon the Contract Disputes Act of 1978 (CDA), 41 U.S.C. § 609(a)(1), and 28 U.S.C. § 1491.

The subject matter of the issues currently before this court stems from the government's motion to dismiss or, in the alternative, its motion for summary judgment. At issue on said motions is: (i) whether this court has subject matter jurisdiction over three (3) counts of Travelers' eight (8) count complaint based, respectively, on an alleged breach of an implied covenant of good faith and fair dealing, an alleged wrongful conversion of payment proceeds, and an alleged breach of an implied contract; (ii) whether the six-year limitation on actions under 28 U.S.C. § 2501 applies to CDA claims; (iii) whether Travelers, as a "completing surety" has standing to maintain an action under the CDA; and (iv) whether the equitable doctrine of laches bars Travelers' entire claim.

After a careful review of the record, and following oral argument, the court denies. both the government's motion to dismiss and its motion for summary judgment.

*Statement of Facts*

On February 24, 1976, Macomb Contracting Corporation (Macomb) entered into a contract with the United States for the construction of a project known as Water Conveyance Facilities, Part II, Pump Stations, Operating Building, and Pipelines, Contract No. DACW5676-C-0111, at Waurika Lake, Beaver Creek, Oklahoma. Pursuant thereto, Macomb was required to furnish all necessary labor, materials, and equipment, and to perform all work for the project and, in consideration thereof, was to be paid $16,672,740.00 for its services.

A *performance* bond for the penal sum of $16,672,740.00, naming the government as obligee and conditioned upon Macomb's satisfactory performance, was also issued by Associated Indemnity Corporation, National Surety Corporation, and Fireman's Fund Insurance Company, as sureties for Macomb, on February 24, 1976. Shortly thereafter, these three surety companies issued a *payment bond* for $2,500,000.00, similarly naming the United States as obli-

gee, conditioned upon Macomb's payment to all persons supplying labor and materials under said contract. Following thereon, Macomb received a notice to proceed on March 15, 1976, but work did not commence until May 5, 1977.

Approximately one year after work on the project had begun, on July 15, 1977, Travelers was appointed by the three (3) original surety companies to act on their behalf in all matters under the foregoing bonds. And, a little over one year after said assignment, by a letter dated August 18, 1978, Macomb informed the government that it was financially unable to complete its obligations under the contract. The government responded to this admitted default by terminating the contract for default on August 28, 1978.

As a consequence of said termination, on October 27, 1978, the government entered into a written Takeover Agreement with Travelers whereby Travelers, as the assignee surety for Macomb, was to complete the work required under the government's contract with Macomb in accordance with the original terms and conditions of that contract. The Takeover Agreement provided, *inter alia*, that the government was to:

> [P]ay the *contractor* (surety) in the manner provided by the contract, but not in excess of the surety's costs and expenses, the balance of the contract price unpaid at the time of default.... (Emphasis added)

The construction contract between Macomb and the government provided that Macomb was to be paid *in installments*, *i.e.*, by progress payments, according to a stipulated performance schedule. The government had made 32 such payments thereunder as of the default date and before the Takeover Agreement with Travelers was executed. The 32nd payment was made on July 5, 1978, for work completed as of June 25, 1978. Payments on the contracted amount may be summarized as follows:

| | Item | Amount |
|---|---|---|
| (i) | Adjusted contract price | $16,698,406.27 |
| (ii) | Total earnings | $15,048,922.31 |
| (iii) | Total retainage | $ 316,968.02 |
| (iv) | Total payments | $14,731,954.29 |
| (v) | Net balance unpaid/unearned | $ 1,966,451.98 |
| (vi) | % of contract unpaid/unearned | 9.88%. |

Because the contract payments made purportedly represented work *satisfactorily* completed, Travelers necessarily concluded that 90.12% of the *work* to be performed under the contract was in fact properly completed according to specifications, and negotiated the Takeover Agreement reasonably believing that *less* than 10% of the contract work had *not* been performed.

Because Travelers contends that the facts prove otherwise, it claims that the government, therefore, fraudulently withheld critical information in the form of memoranda, daily work shift reports, and daily logs and field reports of the government's resident engineer that would have alerted it that Macomb had, in truth and in fact, properly performed *only 74.04%* of the work required of it under the contract. Whereas in actuality Macomb had been progressively paid 90.12% of the contracted amount, some portion of which was improper. In short, Travelers avers that it did not realize that so much of the project (approximately 25%) was yet to be satisfactorily completed until Utility Contractors, Inc., (Utility), a subcontractor hired by Travelers to complete the construction of the project, had begun and performed on a substantial portion of the uncompleted work. This is so because much of the contract work involved the construction of a *60-mile* pipeline, some of which needed to be unearthed before defects could be discovered, verified, and repaired. Travelers also discovered, *subsequent* to the execution of the Takeover Agreement, that not only was a substantial portion of the work that Macomb had performed defective and in need of repair, but that some of the work for which Macomb had been paid was never completed.

In completing the construction of the project, pursuant to the Takeover Agreement, and the performance and payment bonds, Travelers allegedly incurred a total cost of $7,684,121.38, an amount which represents the cost of completing and repairing the contract work ($6,393,685.74) and the cost of labor and material claims ($1,290,435.64) that Macomb did *not* pay.

However, against this background, the government paid Travelers a total of only $2,038,008.27 (*i.e.*, $5,646,113.11 less than what Travelers expended) for work by Utility which took approximately 39 months, from October 27, 1978, to complete.

Because it was not reimbursed its costs in full, *supra*, Travelers submitted a claim to the Army Corps of Engineers' contracting officer on February 18, 1985. The contracting officer initially refused to consider plaintiffs' certified claim. However, following two written demands for a decision on the claim, by letter dated July 18, 1985, the contracting officer dismissed said claim for failure to meet the six-year statute of limitations, 28 U.S.C. § 2501.

Approximately one month thereafter, Travelers filed a complaint in this court, on August 28, 1985. The complaint alleged entitlement to relief in eight (8) counts as follows:

(i) The government breached the Takeover Agreement by failing to pay to Travelers all sums of money due;

(ii) The government breached the covenant of good faith and fair dealing implied in the construction contract, payment bond, and performance bond by making wrongful payments to Macomb and by releasing Travelers' security;

(iii) The government breached the construction contract, performance bond, and payment bond provisions by making wrongful payments to Macomb;

(iv) The government converted a portion of the construction contract proceeds to its own use;

(v) The government misrepresented and concealed information (*i.e.*, the true percentage of completion—74.4% instead of 90.12%) that would have revealed to Travelers that the government breached express and implied warranties made at the time of Macomb's default;

(vi) The government and Travelers executed the Takeover Agreement under a mutual mistake and, therefore, that contract should be reformed. Furthermore, the government committed a fraud in not revealing to Travelers the amount of work *yet to be performed;*

(vii) Because the government breached the Takeover Agreement, fraudulently induced Travelers to enter into said agreement, and because there was no meeting of the minds, said takeover contract should be rescinded; and

(viii) The United States breached an implied contract with Travelers by excluding previous erroneous payments made to Macomb, that were not in accord with the construction contract, from the correct amount of payments owed to Travelers.

Given the foregoing counts pleaded by plaintiff, the parties' legal contentions are next summarized.

*Contentions of the Parties*

(i) Defendant

In its moving brief, the defendant *first* maintained that Travelers' claim is jurisdictionally[1] barred by the six-year statute of limitations of § 2501 because it was not filed with the Claims Court within six years from the accrual of the cause of action. Since that time, however, the Court of Appeals for the Federal Circuit issued its decision in *Pathman Construction Co. v. United States,* 817 F.2d 1573 (Fed.Cir. 1987), holding that the *12–month limitations period* within which a contractor has to file, in the Claims Court, a suit challenging a contracting officer's decision, *see* 41 U.S.C. § 609, does not begin to run until the contracting officer *has issued* an actual written decision. Stated differently, *Pathman, supra,* holds that "[o]nce a contractor elects to proceed under the Contract Disputes Act, the six-year statute of limitations in 28 U.S.C. § 2501 is *not* applicable." *Id.* at 1580. The government, recognizing the significance of this decision, now argues hospitably in its reply brief that only Counts I and VI of Travelers' complaint (those counts based upon the Takeover Agreement as opposed to the bonds or the construction contract) were *affected* by the *Pathman* decision in that they are the only

---

**1.** *LaMear v. United States,* 9 Cl.Ct. 562, 568 n. 6 (citing *Nager Electric Co. v. United States,* 177 Ct.Cl. 234, 249, 368 F.2d 847, 857 (1966)), *aff'd,* 809 F.2d 789 (Fed.Cir.1986).

counts truly under the Contract Disputes Act. The remaining six counts (II, III, IV, V, VII, and VIII), maintains the government, are still barred by § 2501 because they are non-CDA causes of action based upon plaintiffs' status as a surety that accrued *more* than six years prior to Travelers' filing said claims in this court.

For its second ground for dismissal, the defendant argues that Travelers' allegations of breach of implied covenant of good faith (Count II), breach of implied contract (Count VIII), and wrongful conversion of contract proceeds (Count IV) are outside the jurisdiction of this court. In support of this position, the government—argues that no facts have been alleged from which an implied-in-fact contract can be found to exist; characterizes Travelers' allegations of breach of the implied covenant and implied contract as "implied-in-law contracts," over which this court does not have jurisdiction; and also contends that an implied-in-fact contract cannot be recognized where as here an express contract covering the same subject matter already exists. Furthermore, argues the government, as a claim based upon "wrongful conversion" sounds in tort, *not contract*, this court is without jurisdiction to hear said plea.

Lastly, the defendant has also filed a motion for summary judgment attacking all eight (8) counts should the court deny its motion to dismiss. This last contention is based on its assertion that the equitable doctrine of laches bars Travelers' entire claim because the government was substantially prejudiced as a result of Travelers' inexcusable delay in bringing its action in this court.

(ii) Plaintiffs

Travelers responds to the government's motions by arguing, first, that *all* counts in its complaint are properly brought under the CDA, and also calls attention to the fact that the government made the converse argument for the first time in its reply brief. According to Travelers, because it executed a *separate* Takeover Agreement with the government, agreeing to complete the construction contract under the initial terms and conditions therein, the counts in its complaint are therefore based upon its *contractual* relationship with the government, not its status as surety. Therefore, concludes Travelers, *all* of the counts in its complaint, which are based at least in part on either the Takeover Agreement, the construction contract, or both, may be brought under the CDA, 41 U.S.C. § 601, *et seq.*, and, contrary to the government's position, § 2501 is therefore inapplicable.

Arguing in the alternative to its above-stated position, Travelers also claims that it has fully met the six-year limitations of § 2501 whether or not the counts are under the CDA. As Travelers explains, it could not institute an₀ action against the government until it could legally demand payment—upon *completion* of its contract, *i.e.*, on or about January 19, 1982. Only then, says Travelers, could it have known the accurate fact and the extent of the original contractor's *incomplete* and *improperly completed work*. Consequently, argues plaintiff, since the complaint was timely filed in this court on August 28, 1985, well within six years from and after January 19, 1982, the § 2501 requirement was obviously met.

Responding to the government's second ground for dismissal, Travelers supports its assertion, that this court has subject matter jurisdiction, by arguing that Count II is not based on the alleged existence of an implied contract, but on an implied obligation existing within an express contract. As to Count IV, Travelers explains the distinction between a tortious breach of contract claim, over which this court has jurisdiction, and an independent "tort" claim, over which this court does *not* have jurisdiction. Count VIII, contends Travelers, is an implied-in-fact contract, the existence of which may be reasonably inferred from the conduct of the parties.

Finally, in regards to the government's motion for summary judgment, Travelers maintains that the doctrine of laches is *not* available to the government in contract actions for two reasons. First, where the plaintiffs have overcome an existing stat-

ute of limitations governing that action, there can be no defense of laches; and second, where the defendant, as here, has acted with "unclean hands" in concealing from Travelers the fact of its cause of action, it cannot raise the defense of laches. *See* Affidavit of L. Lerner, ¶ 18, Plaintiffs' Response Brief at 41. Travelers also argues that as it had repeatedly informed the government of its intention to bring this action as far back as 1978, the government cannot be said to have been prejudiced as a result of any delay on the part of Travelers. In addition, as the contract was for the construction of approximately 60 miles of underground pipeline, and that some, if not much, of the evidence that would have alerted Travelers to the existence of its cause of action was not revealed until certain portions of the pipeline had been unearthed by Utility under the Takeover Agreement, and as the claim was for a large amount of money and was based upon a detailed analysis of voluminous records, any delay on the part of Travelers in instituting its action was not unreasonable under the circumstances. *See* Affidavit, *supra,* at 41.

*Questions Presented*

I. Whether this court lacks subject matter jurisdiction over those claims of Travelers based upon implied covenant of good faith, implied contract, and wrongful conversion of contract proceeds.

II. Whether all of Travelers' counts in its claim are properly before the court under the Contract Disputes Act, 41 U.S.C. § 601 *et seq., i.e.,* is Travelers a "contractor," as that term is defined under § 601; and whether the six-year statute of limitations of 28 U.S.C. § 2501 is applicable to such a claim.

III. Whether the defense of laches may be asserted by the government in a contract case and whether Travelers' entire claim is barred by the equitable doctrine of laches because its unreasonable delay in bringing this action prejudiced the government.

*Discussion*

I. Introduction

Our threshold focus addresses the defendant's challenges to this court's subject matter jurisdiction over three (3) of Travelers' eight (8) counts for relief (*i.e.*, Counts II, IV, and VIII), and finds them to be without merit. Next, the court explains why the six-year statute of limitations, 28 U.S.C. § 2501, does not apply to such claims properly brought under the Contract Disputes Act (CDA), 41 U.S.C. §§ 601–613. The narrow issue, preliminary to said determination, then becomes—whether Travelers is a "contractor," as that term is defined under the CDA, § 601(4), for purposes of maintaining a breach action under the CDA. As to this issue, the court resolves it in the affirmative.

Finally, we will address the government's motion for summary judgment premised on the laches doctrine. The court there observes that a defendant is entitled to raise the defense of laches where, as here, no statute of limitations bars the particular claim. Because Travelers, however, by raising allegations of fraud and concealment on the part of the government, has properly raised a genuine issue of fact regarding the government's laches defense, a summary judgment herein would be inappropriate. Furthermore, the court, upon examining the merits of the government's laches defense, finds that Travelers has not *not* been shown to have delayed unreasonably in bringing its action and, moreover, the government has not creditably shown that it was prejudiced to any significant extent by such delay. Given the foregoing, we find that both the government's motion to dismiss and its motion for summary judgment should be denied.

II. Subject Matter Jurisdiction

As the government claims that this court lacks subject matter jurisdiction over three (3) of Travelers' eight (8) counts for relief, our discussion must begin with that issue, i.e., Counts II, IV, and VIII. This is so because until subject matter jurisdiction in this court is established, a determination as to whether any counts are barred by the statute of limitations or by the equitable doctrine of laches would, of course, be premature.

The government's first argument in this regard is that this court lacks subject matter jurisdiction over Counts II and VIII of Travelers' complaint because no cause of action exists against the government based on contracts implied-in-law. While this court certainly recognizes that its jurisdiction under the Tucker Act, 28 U.S.C. § 1491, does not extend to implied-in-law contracts, also known as "quasi-contracts," *see H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1575 (Fed.Cir.1984); *Algonac Manufacturing Co. v. United States*, 192 Ct.Cl. 649, 674, 428 F.2d 1241, 1255–56 (1970) (citing *Merritt v. United States*, 267 U.S. 338, 341, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925)), it does not agree with the government's premise that said counts may properly be so characterized.

■ Count II is based on an "implied covenant of good faith and fair dealing" implicit in the performance bond, payment bond, the Takeover Agreement, and construction contract. Such an implied *covenant* is not to be confused with a *separate* implied contract, for the covenant is merely an obligation, or promise, that is implicitly contained *within* an existing contract. As stated in the case of *Tymeshare, Inc. v. Covell*, 727 F.2d 1145, 1152 (D.C.Cir.1984) (Scalia, J.) (emphasis added):

> [It is] clear that the doctrine of *good faith* performance is a means of finding *within a contract* an implied obligation not to engage in a particular form of conduct which ... constitutes "bad faith."

This implied obligation of good faith is present in all contracts, *see* 5 Williston, A Treatise on the Law of Contracts § 670 (3d ed. 1961), and is not to be confused with a separate and independent contract implied-in-law. In *Heyer Products Co. v. United States*, the United States Court of Claims, after recognizing that an unsuccessful bidder on a government contract could not state a cause of action based on an implied-in-law contract, held that:

> ... by the solicitation of bids, the Government impliedly promised that it would give honest and fair consideration

to all bids and would not reject any one of them arbitrarily or capriciously.... 147 Ct.Cl. 256, 258, 177 F.Supp. 251, 252 (1959). As is clearly recognized, therefore, an implied covenant is not an implied-in-law contract. *See San Jose Construction Credit Ass'n v. Old Republic Life Insurance Co.*, 723 F.2d 700, 703–04 (9th Cir. 1984).

Because Count II of Travelers' complaint is based on an implied covenant existing within the performance bond, the payment bond, the construction contract, and the Takeover Agreement (express contracts), it is not, *ipso facto*, an implied-in-law contract. Therefore, Count II of Travelers' complaint, we find, is not jurisdictionally barred on that basis.

Count VIII of Travelers' complaint, however, is based on an alleged breach of an "implied contract between Travelers and the United States [existing at the time of default by Macomb and the takeover by Travelers]." This court must therefore determine whether this alleged "implied contract" is grounded in fact or in law.

■ A contract implied-in-law is not a true contract. It requires no element of assent or meeting of the minds. It is "but a duty imposed by law and treated as a contract for the purposes of a remedy only" and may not even embrace the true intentions of the parties. *Algonac Manufacturing*, 192 Ct.Cl. at 674, 428 F.2d at 1255–56 (quoting 17 C.J.S. Contracts § 4 (1963)). A contract implied-in-fact, conversely, "is founded upon a meeting of the minds, which, although *not* embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Baltimore & Ohio R.R. v. United States*, 261 U.S. 592, 597, 43 S.Ct. 425, 426, 67 L.Ed. 816 (1923), *cited in Russell Corp. v. United States*, 210 Ct.Cl. 596, 609, 537 F.2d 474, 482 (1976); *Algonac Manufacturing, supra; Prevado Village Partnership v. United States*, 3 Cl.Ct. 219, 224 (1983).

■ Were this a case where the two parties never entered into any negotiations, never signed any agreements, and never

transacted business with one another, regarding the prime contract the court might have more difficulty determining whether Count VIII of the complaint was premised upon a contract implied-in-law or in-fact. Here, however, the parties have substantially interacted with one another in executing the performance and payment bonds and the Takeover Agreement. That there exists conduct by the parties from which the court might reasonably infer the existence of an intent to enter into a contract is undeniable. *See Johns–Manville Corp. v. United States*, 12 Cl.Ct. 1, 21 (1987).

On the other hand, the government argues that because there is an *express* contract between the two parties that outlines their rights and obligations with respect to payment, an implied-in-fact contract relating to the same subject matter cannot be recognized. The court agrees with the government's argument *as a general principle. See ITT Federal Support Services, Inc. v. United States*, 209 Ct.Cl. 157, 531 F.2d 522, 528 (1976) (citing, *inter alia, Klebe v. United States*, 263 U.S. 188, 44 S.Ct. 58, 68 L.Ed. 244 (1923); *Algonac Manufacturing*, 428 F.2d at 1255). However, this general rule does not apply where the existence of an implied-in-fact contract is pleaded *n the alternative. See Algonac Manufacturing*, 428 F.2d at 1255 (citing 17 C.J.S. Contract § 5 (1963)).

Travelers, in Count VIII of its complaint, prays for judgment in the amount of $5,646,113.14 for breach of this alleged implied-in-fact contract. Said amount purports to represent the reasonable value of work performed by Travelers less payments previously made by the United States, and is identical to the amount of recovery prayed for in Count VII, which is based upon the theory that Travelers is entitled to an equitable rescission of the Takeover Agreement due to certain acts and omissions of the United States. It is therefore clear, although not specifically stated by Travelers in its complaint, that Count VIII is pleaded in the alternative to its claim for equitable rescission of an express contract. Given the foregoing, the court therefore finds that it has subject matter jurisdiction over Count VIII of Travelers' complaint.

▆▆ The government's final argument, with respect to the absence of subject matter jurisdiction, is that Count IV, to the extent that it contains an allegation of a wrongful conversion of construction contract proceeds, is grounded in tort law, not contract law, and is therefore beyond this court's jurisdiction. It is fundamental that the Tucker Act, 28 U.S.C. § 1491(a)(2), grants this court jurisdiction over claims against the United States that are based upon expressed and implied-in-fact contracts, *not* torts. However, a claim that is based upon a "tortious breach" of such a contract is properly within this court's Tucker Act jurisdiction. As stated by the United States Court of Claims:

> Where ... a claim is based on breach of contract it is properly within the jurisdiction of this court even though it also alleges that defendant engaged in tortious conduct in breaching the contract. In *Fountain v. United States*, 192 Ct.Cl. 495, 427 F.2d 759 (1970), *cert. denied*, 404 U.S. 839 [92 S.Ct. 131, 30 L.Ed.2d 73] (1971), we specifically stated that "[i]f contractual relations exist, the fact that the alleged breach is also tortious does not foreclose Tucker Act jurisdiction." *Id.* at 498, 427 F.2d at 761.... Insofar as plaintiff's references to defendant's alleged misrepresentations are merely another way of asserting that a breach of contract occurred, the ... claim is not barred simply because it might also be stated as a tort.

*Olin Jones Sand Co. v. United States*, 225 Ct.Cl. 741, 745 (1980). Whether there has been a "tortious breach of contract" depends upon whether the alleged tort existed independently of the contract. Courts, in making such a determination, place great emphasis on the existence of a contractual agreement between the parties. *See Burtt v. United States*, 176 Ct.Cl. 310, 314 (1966).

In the case at bar, Travelers does not allege that the payment of the construction contract proceeds to Macomb was tortious independently of the contract. Clearly,

Travelers' claim of wrongful conversion is based upon its claimed right to such proceeds as a result of the Takeover Agreement, the performance bond, and the construction contract. Said claim differs only in form, and not in substance, from others contained in the complaint that are based upon breach. The court, therefore, finds that it has subject matter jurisdiction over Count IV of Travelers' complaint in that the alleged "wrongful conversion" of contract proceeds is dependent upon a contract with the government and is therefore properly characterized as a claim based on "tortious breach of contract."

### III. Contract Disputes Act

#### A. *Statute of Limitations*

In its moving brief in support of its motion to dismiss, the defendant strenuously argues that Travelers' entire claim (*i.e.*, eight (8) counts) is barred by the six-year limitation provision under 28 U.S.C. § 2501.[2] The government's position on this premise is that while precedent holds that a claim filed in this court under the *CDA* within 12 months of the contracting officer's decision is timely, "to the extent these decisions suggest that such a rule would be applicable to a claim first submitted to a *contracting officer* over six years after it had first accrued, that rule would be contrary to ... controlling precedent." In short, defendant avers that even if the claim is under the CDA, "where such claims are submitted to the contracting officer more than six years after they accrued they are barred by the six-year statute of limitations." For this proposition, defendant relies on *Zinger Construction Co. v. United States*, 231 Ct.Cl. 926 (1982),[3] and further avers that "[o]nce a claim has been barred by the six-year statute of limitations, that claim has expired...." The proper conclusion, says defendant, is that "[t]his Court lacks jurisdiction over Travelers' claim [all counts], submitted to the contracting officer on February 18, 1985

[where the cause of action accrued as early as June and as late as October 1978, more than six years prior thereto]." *See* Defendant's Motion To Dismiss, April 15, 1986, pp. 7–9. Defendant *initially* persevered in this position even with respect to Counts I and VI in which plaintiffs alleged relief under the Takeover Agreement. Said agreement is unquestionably a contract between defendant and Travelers, thus necessarily implicating the CDA. In such case, Travelers would clearly be a contractor thereunder, and the 12–month limitation period would apply. 41 U.S.C. § 609(a)(3).

However, following the Court of Appeals decision in *Pathman*, 817 F.2d at 1580, where the court held that "[o]nce a contractor elects to proceed under the [CDA], the six year statute of limitations in 28 U.S.C. § 2501 is *not applicable*" (emphasis added), the government retreated from its position, *supra*, only with respect to Counts I and VI of Travelers' complaint. That is to say, the government now concedes that said two counts are *not* barred by 28 U.S.C. § 2501, as they are clearly based upon the Takeover Agreement and thus controlled by the 12–month limitation period of the CDA. As to the remaining counts, however, defendant continues its position that they are not CDA claims. The court agrees with defendant's concession regarding Counts I and VI but not with respect to the balance of the counts. In *Pathman*, however, the plaintiff had filed its claim with the contracting officer before the six-year period of § 2501 had expired. The government maintains here, however, that Travelers' claim was barred by § 2501 before it elected to proceed under the CDA, and that therefore the CDA cannot be said to revive the claim.

█ This issue was addressed in an earlier Claims Court decision, *LaCoste v. United States*, wherein the court stated:

---

2. 28 U.S.C. § 2501 provides: "Every claim of which the United States Claims Court has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues."

3. *Zinger* is not squarely applicable to the case at bar. At issue therein was whether § 2501 applied to an action brought under the Wunderlich Act, 41 U.S.C. §§ 321–322, not the CDA.

[A] contractor's failure to act administratively within a reasonable time on his claim does not render the six-year statute applicable simply because the CDA's one limitations period speaks only to the deadline for initiating the court process. To the contrary, the CDA explicitly states that all actions under the CDA shall be governed by the CDA's provisions.

Allowing a contractor to proceed in court under the circumstances present could have been avoided had the CDA limited the time within which the contractor is required to present his claim to a contracting officer. It did not. Even if defendant's argument is consistent with the CDA's legislative goal of arriving at prompt resolution of contract claims, the court's function is not to fashion a judicial bandage for an unfortunate gap in legislation.

9 Cl.Ct. 313, 315 (1986), *cited in Pathman*, 817 F.2d at 1580 (citations omitted). As the Court of Appeals for the Federal Circuit has cited to this language in its holding that "[o]nce a contractor elects to proceed under the [CDA], the six-year statute of limitations in 28 U.S.C. § 2501 is not applicable," it must be interpreted very literally by this court. 817 F.2d at 1580. It is therefore held that the six-year limitation of § 2501 does not apply *at all* to a claim properly brought under the CDA although more than six years may have expired from the accrual of a cause of action to the time a claim is filed with the contracting officer.

### B. *Contract Disputes Act, 41 U.S.C. §§ 601 et seq.*

The court now turns to the government's alternative position. In that connection, defendant avers that, although Travelers is a surety to a government contract, it is not a "contractor" for purposes of maintaining an action regarding the *remaining* counts (excepting Counts I and VI) under the CDA with reference to any alleged breaches stemming from the prime contract, the performance, or the payment bonds, and § 2501, therefore, applies. The term "contractor" is defined under the CDA as "a party to a Government contract other than

the Government." § 601(4). Only such a person may maintain an action under the CDA, 41 U.S.C. §§ 601 *et seq.* The government argues that as Counts II, III, IV, V, and VIII of Travelers' complaint are based on an alleged breach of the construction contract, performance bond, and payment bond, but not the Takeover Agreement, such counts are dependent upon the "subrogation theory" enunciated in *Balboa Insurance Co. v. United States*, 775 F.2d 1158 (Fed.Cir.1985), and are, therefore, not "CDA claims." As such, contends the government, those particular counts for relief are still barred by § 2501. The court disagrees.

■ Travelers is unquestionably a "surety" as a result of its appointment to act on behalf of those parties that executed a performance bond and a payment bond with the original contractor, Macomb. Under a "performance bond," the surety guarantees that the project will be completed if the contractor defaults, whereas under a "payment bond," it obligates the surety to pay the subcontractors and materialmen should the prime contractor fail to do so. *See Dependable Insurance Co. v. United States*, 846 F.2d 65 (Fed.Cir.1988). As was made clear in *Balboa*, a suretyship is, by definition, *a tripartite agreement.* While the government typically is not a signatory to the contract, it is nevertheless the primary beneficiary of the surety's obligation. Pertinent to the foregoing, the Court of Appeals for the Federal Circuit stated that "A suretyship is the result of a three-party agreement, whereby one party (the surety) becomes liable for the principal's or obligor's debt or duty to the third party obligee (the government).... [A]nd no suretyship exists in the absence of any of the three parties." *See Balboa*, 775 F.2d at 1160; *see also Universal Surety Co. v. United States*, 10 Cl.Ct. 794, 799 (1986). Critical to the foregoing is the unequivocal holding in *Balboa*, 775 F.2d at 1160, where the court stated that "a surety, as bondholder, *is as much a party to a Government contract as the contractor*" (emphasis added). "The terms of the bond are read into the contract [with the govern-

ment], and there is default under the contract when there is default under the bond." *Martin v. National Surety Co. v. United States*, 300 U.S. 588, 598, 57 S.Ct. 531, 535, 81 L.Ed. 822 (1937), also *quoted* in part *in Balboa*, 775 F.2d at 1161.

■ Upon default by the prime contractor, the rights of the surety are often said to be limited to recovery of the contract balance held by the government at the time it is notified of the default. *See Dependable Insurance*, 846 F.2d at 67; *Balboa*, 775 F.2d at 1163. A "completing surety" that has executed a *separate* takeover agreement, as here, incorporating the original construction contract, however, has greater rights.

In *Carchia v. United States*, 202 Ct.Cl. 723, 735, 485 F.2d 622, 628 (1973), the court held that a completing surety, *i.e.*, one that has executed a Takeover Agreement to complete performance under the original construction contract upon the original contractor's default, had standing to sue the government *on the takeover contract* for extra work that it had performed in excess of that contemplated in the original contract price. With the existence of a takeover agreement, therefore, "the surety, in effect, becomes the contractor, subject to the terms of the new agreement." *Universal Surety*, 10 Cl.Ct. at 800; *see also Transamerica Insurance Co. v. United States*, 6 Cl.Ct. 367, 371 (1984); *Morrison Assurance Co. v. United States*, 3 Cl.Ct. 626 (1983).

■ As Travelers, here, has executed such a takeover agreement, it necessarily possesses greater rights to sue the government than might a non-completing surety. In fact, upon the execution of said Takeover Agreement, Travelers became the prime party in privity with the government. It is, therefore, the holding of this court that where a surety has executed a takeover agreement, as here, upon the default of the prime contractor in order to complete the work under *the* construction contract, it becomes a "party to a Government contract" and thus, logically, a "contractor" within the meaning of § 601(4) of the CDA. *See Balboa*, 775 F.2d at 1160.

The court notes that such a result best serves the policy considerations underlying the CDA. This is apparent because the legislative history of the CDA states that the requirement that one be a contractor to have standing under the CDA was to achieve a "single point of contact" between the contractor and the government so that the government would not be faced with multiple suits by numerous parties involved with the same project. *See* S.Rep. No. 1118, 95th Cong., 2d Sess. 16, *reprinted in* 1978 U.S.Code Cong. & Admin.News 5235, 5250. Therefore, the right to sue the government over the construction contract was therefore limited to the contractor. *See* 41 U.S.C. § 601. Here, the original contractor is in default and apparently has no claim for having *received* payment for incomplete or defective work; Utility was never a party to a government contract; the completing surety—resultingly Travelers—is the *only party* involved in the project that was "a party to a Government contract" with regard to the issues raised herein. To preclude Travelers from suing under the CDA, on the facts here, would be extremely harsh and inconsistent with the intent of that act.

The court is not unmindful of several recent decisions holding that a surety is not a contractor under the CDA. *See United States v. Seaboard Surety Co.*, 817 F.2d 956 (2d Cir.1987); *Fidelity & Deposit Co. v. United States*, 14 Cl.Ct. 421 (1988); and *Universal Surety Co. v. United States*, 10 Cl.Ct. 794 (1986). In each of these cases, however, the significant distinguishing factor is that the surety had not completed the contract. The case of *Universal Surety*, for example, is a recent Claims Court decision holding that a surety, because it has privity with the government *only* with respect to the surety bonds, and not the construction contract, is not a "contractor" under the CDA. 10 Cl.Ct. at 800. That holding, however, was explicitly and unequivocally limited to a situation in which a separate takeover agreement had *not* been executed between the government and the surety. *See id.* In the case at bar there *is* a Takeover Agreement. Such a significant

distinction makes *Universal Surety,* a case relied upon heavily by the government herein, wholly inapplicable.

Turning back to Travelers' complaint, the court notes that the government does not challenge Travelers' right to maintain an action under the CDA with respect to any count in its complaint based upon an alleged breach of the Takeover Agreement (*i.e.,* Counts I, VI, and VII). Clearly, Travelers has standing under the CDA as a "contractor" for claims based upon the Takeover Agreement, as that is a construction contract between Travelers and the government only.

In Counts II, III, IV, V, and VIII of the complaint, however, Travelers also seeks to recover allegedly improper payments based, collectively, upon the construction contract, payment bond, and performance bond. In this connection we believe, at least by implication, that the performance and payment terms of the construction contract between Macomb and the government (necessary to *complete* the project) were expressly incorporated into the Takeover Agreement between Travelers and the government. Paragraph 8 of the Takeover Agreement provides as follows:

> The Surety agrees to complete the work required by the defaulted Contract ... [between Macomb and the government] in accordance with the terms and conditions of that contract. The Government will pay the contractor (Surety) in the manner provided by the contract, but not in excess of the Surety's costs and expenses, the balance of the contract price unpaid at the time of default, subject, however, to the following conditions.

As Travelers can maintain an action under the CDA based upon the Takeover Agreement, we hold that it may also maintain an action based upon the construction contract terms to the extent that they are incorporated by reference into such agreement. This we hold for the additional reason that whereas here the CAFC has held that "a surety ... is as much a party to *the government contract as the contractor.*" *See Balboa,* 775 F.2d at 1160 (emphasis added).

Therefore, we hold that the government's motion to dismiss is denied.

### IV. Motion For Summary Judgment: The Equitable Doctrine of Laches

Alternatively, the government moves for summary judgment on the ground that Travelers' claim is barred by the equitable doctrine of laches. In response, Travelers makes two arguments—(i) the doctrine of laches cannot be asserted in a government contract case, and (ii) because the government has "unclean hands" by virtue of its fraudulent concealment and misrepresentation of facts that would have, prior to the execution of the Takeover Agreement, alerted Travelers to the existence of the erroneous payments to Macomb, it may not, as a consequence, raise such a defense. While the court finds that laches is an available defense for the government in contract actions, the court also finds that the government has not shown by creditable and uncontroverted facts that it is entitled to such a defense. In short, we find that there are genuine issues of material fact and a failure of the government to carry its burden. RUSCC 56(c); *Weide v. United States,* 4 Cl.Ct. 432 (1984), *aff'd,* 765 F.2d 157 (Fed.Cir.1985), *cert. denied,* 474 U.S. 822, 106 S.Ct. 74, 88 L.Ed.2d 61 (1985).

The doctrine of laches, as Travelers notes, has rarely been recognized in government contract cases. This is so, however, not because of the want of equitable considerations, but simply because the doctrine of laches is inappropriate where a statute of limitations exists and, prior to the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–609 (CDA), nearly all government contract cases were subject to the six-year statute of limitations period of 28 U.S.C. § 2501. *See Standard Oil Co. v. United States,* 231 Ct.Cl. 86, 685 F.2d 1322 (1982) (prior to CDA; laches does not apply where a statute of limitations exists); *Swentek v. United States,* 208 Ct.Cl. 981, 982, 529 F.2d 532 (1975) (laches is not a defense in a government contracts case where § 2501 applies); *Fraas Surgical Manufacturing Co. v. United States,* 205

Ct.Cl. 585, 592, 505 F.2d 707, 710 (1974) (laches is not appropriate in a contract action); *H & M Moving, Inc. v. United States,* 204 Ct.Cl. 696, 719, 499 F.2d 660, 672 (1974) (laches is not an available defense in a government contract action); *Kaiser Aluminum & Chemical Corp. v. United States,* 181 Ct.Cl. 902, 906–07, 388 F.2d 317, 319–20 (1967) (laches is unavailable where § 2501 establishes limitations on actions). In a comprehensive review of the doctrine, Judge Mayer stated that "[b]ecause laches is an equitable defense, it has traditionally been unavailable in actions at law brought within the applicable statute of limitations." Nevertheless, it has been applied to actions at law "even before the limitation period has run." *Cornetta v. United States,* 851 F.2d 1372, 1375 (Fed.Cir.1988) ("The doctrine of laches emerged in an era when equity courts were not bound by statutes of limitations"). In a recent United States Claims Court case that held that § 2501 did not apply to a claim brought under the CDA, laches was applied instead. *See LaCoste v. United States,* 9 Cl.Ct. at 315–16 (citing *Zinger Construction Co. v. United States,* 231 Ct.Cl. 926, 928 (1982)) (where Disputes Clause of Wunderlich Act does not fix a time within which to present a claim administratively, contractor cannot do so whenever he likes); *see also Nager Electric Co. v. United States,* 177 Ct.Cl. 234, 368 F.2d 847 (1966).

▮▮▮ Because we have found that no statute of limitations exists to bar Travelers' CDA claims, *supra,* the Government is not precluded from asserting the defense of laches in this case, consistent with the holding of *S.E.R., Jobs For Progress, Inc.*

*v. United States,* 759 F.2d 1, 8–9 (Fed.Cir. 1985).[4] However, with respect to Travelers' argument regarding the government's "unclean hands," the court cannot so easily dismiss Travelers' challenges as to the government's ability to assert the laches defense.

▮▮▮ The doctrine of "unclean hands," which prevents a wrongdoer from succeeding in a court of equity, has its roots in the maxim: "He who comes into equity must come with clean hands." *Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 814, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945). This is not to say that those asserting equitable defenses shall have led blameless lives, but only that they "shall have acted fairly and without fraud or deceit as to the controversy in issue." *Id.* at 814–15, 65 S.Ct. at 997. Furthermore, the court has wide discretion in "refusing to aid the unclean litigant." *Id.* at 815, 65 S.Ct. at 997.

The doctrine has often been used as a bar to the assertion of the equitable defense of laches. *See FMC Corp. v. Spurlin,* 596 F.Supp. 609 (W.D.Pa.1984) (citing *John Wright, Inc. v. Casper Corp.,* 419 F.Supp. 292, 322 (E.D.Pa.1976)) (defendant who is a conscious wrongdoer can only succeed on a laches defense if plaintiff's delay amounts to a virtual abandonment of his rights); *see also Regional Properties, Inc. v. Financial & Real Estate Consulting Co.,* 752 F.2d 178, 182–83 (5th Cir. 1985).

The government attempts to refute Travelers' allegations of "unclean hands" by stating that a mere "unsworn affirmation

---

**4.** *S.E.R., supra,* at 8–9 states in pertinent parts as follows (footnote omitted):

While acknowledging that the Court of Claims has consistently declined to apply laches in Government contract cases, we do not read its decisions as precluding the application of this doctrine in all such cases. Even in those contract cases where it declined to apply laches, the court generally refrained from stating that laches could never apply in such cases. Instead, in most of them, the court added that the facts under consideration did not justify invoking the doctrine of laches.

\* \* \* \* \* \*

Thus, after a careful perusal of the foregoing Court of Claims contract cases, we do not think that the thrust of the decisions is that laches is always inapplicable *per se* in any contract or other claim where a legal rather than an equitable remedy is sought. Instead, the court has decided that laches cannot ordinarily be invoked as a defense to legal claims where a statute of limitations is normally available to preclude the recovery on stale claims, unless the offended party has been unmistakably prejudiced by the delay in the assertion of the claim.

made on information and belief is not entitled to any weight and is insufficient to support an opposition to a motion for summary judgment on the question of laches." *See* Defendant's Reply Brief at 7. The court fully recognizes the non-moving party's obligation to come forward with specific facts set forth in detail in an affidavit by a knowledgeable affiant in order to defeat a motion for summary judgment. *Barmag Barmer Maschinenfabrik Ag v. Murata Mach., Ltd.,* 731 F.2d 831, 835–36 (Fed.Cir. 1984); RUSCC 56(e) and Appendix H. Travelers', however, has met that burden.

Included in the appendix of Travelers' response to the government's motion to dismiss is the sworn affidavit of Lawrence Lerner, a former associate in the law firm of Margolin & Kirwan, attorneys for Travelers, who was personally involved with this case from August 1982 to July 1985. Paragraph 18 of that affidavit states as follows:

> The monthly Network Analysis, progress payments estimates, payment procedures and information disclosed by the Government concealed the facts of when and to what location, value, and extent Macomb had been paid contract proceeds for work allegedly performed but which, in fact, was not performed in strict accordance with the contract plans and specifications.

*See* Affidavit, *supra* p. 8, at 41.

While Mr. Lerner's affidavit does not substantially prove that the government acted with unclean hands by concealing information as to the amount of the contract work yet to be performed, it does create a prima facie showing of an evidentiary conflict that can only be resolved at trial. The court therefore holds that the government's defense of laches must fail. *See* RUSCC 56(a), (c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–51, 106 S.Ct. 2505, 2510–12, 91 L.Ed.2d 202 (1986).

Notwithstanding the fact that there are questions of fact still remaining, the government's laches defense fails to meet the necessary elements as well. In order to establish a successful defense of laches, the burden rests on the defendant to show undue prejudice stemming from unreasonable delay. *See Cornetta,* 851 F.2d at 1377–78; *Deering v. United States,* 223 Ct.Cl. 342, 620 F.2d 242, 245 (1980); *Pepper v. United States,* 794 F.2d 1571, 1573 (Fed.Cir.1986).

### A. *Unreasonable Delay*

[T]he mere fact that time has elapsed from the date a cause of action first accrued is not sufficient to bar suit; the delay must be unreasonable and unexcused.

*Cornetta,* 851 F.2d at 1377–78. In *LaCoste,* a government contract case in which the doctrine of laches was found to bar plaintiff's action, the plaintiff was asked repeatedly by the government to soon file a claim if it intended to ultimately do so, but it did not respond. Five years after the cause of action arose, the government received a mailgram from the plaintiff advising that it was submitting a claim. Another letter followed containing broad allegations and with no assigned monetary value. The contracting officer responded with a request for more information regarding the claim. Plaintiff did not respond. Nearly one year later, the government sent a letter to plaintiff stating that if no claim was received within 30 days, the contracting officer would treat plaintiff's second letter as a claim. The plaintiff still did not respond, and the contracting officer then treated the second letter as a claim, conducted an investigation, and denied the claim. One year to the day following the contracting officer's denial, plaintiff appealed the contracting officer's decision to the United States Claims Court. *See LaCoste,* 9 Cl.Ct. at 315–16. The court found such a delay to be "unreasonable." *See id.*

The facts of the case at bar are quite dissimilar to *LaCoste.* Here, Travelers responded to every government request for action—even met with the government to discuss the claim—by repeated assurances that a claim would be filed. The government was aware that Travelers was expending a large amount of time and money compiling information regarding the *propriety* of a suit against the government.

Unlike either *LaCoste*, 9 Cl.Ct. 315–16, or *Zinger*, 231 Ct.Cl. at 928, in which the plaintiff never provided the court or the defendant with any explanation whatsoever for its delay in filing, Travelers has explained, and the government has not refuted, that it had to employ a special staff of workers specifically for the purpose of computing the amount of losses it allegedly suffered in fulfilling its performance bond and the terms of the Takeover Agreement. Such computation could not even *begin* until some significant portion of approximately 60 miles of pipeline was evaluated and inspected and the full amount of repairs and construction necessary to complete its performance was ascertainable, and could not be *completed* until nearly three years after the contract work was completed, i.e., January 19, 1982. *See* Plaintiffs' Response Brief at 36–42; Plaintiffs' Supplemental Response Brief at 18.

The affidavit of Lawrence Lerner, *supra* p. 8, explains, in minute detail, the exhaustive effort and manpower expended in order to determine the extent of Travelers' claim. This effort, avers Travelers, was imperative to satisfy the magic words contained in the CDA's certification requirement, to wit (§ 605(c)(1)):

> the contractor shall certify that the claim is made in good faith, that the supporting data are accurate and complete ... and that the amount requested accurately reflects the contract adjustment for which the contractor believes the government is liable.

We believe, against this background, that plaintiff's showing per Mr. Lerner's affidavit sufficiently rebuts any adverse inference otherwise deducible by the mere passage of time running from the Takeover Agreement (October 27, 1978) to the time the claim was filed with the contracting officer on February 18, 1985.

 Moreover, the court cannot here, on this record, decide exactly when Travelers' cause of action accrued. The question of exactly when an alleged wrongdoing was or should have been discovered, for purposes of deciding when the statute of limitations began to run is a question of fact, and can only be decided on a summary judgment motion when the evidence *irrefutably* demonstrates that plaintiffs should have discovered the wrongdoing. *See Mosesian v. Peat, Marwick, Mitchell & Co.*, 727 F.2d 873 (9th Cir.1984); RUSCC 56(c). The evidence, on this record, fails to so demonstrate. Therefore, the court cannot know just how long Travelers actually delayed in filing its claim, if any and has no basis on this record upon which to hold that Travelers delayed unreasonably.

## B. *Prejudice*

The second indispensable prong of a successful laches defense is "prejudice to the defendant." *Brundage v. United States*, 205 Ct.Cl. 502, 504 F.2d 1382, 1384 (1974). In addition to the foregoing, the government has also failed to show that it has been *unduly prejudiced.* Notwithstanding defendant's contention, it is clear beyond cavil that even a lengthy delay does not *ipso facto* establish undue prejudice. *See Tyler v. United States*, 220 Ct.Cl. 387, 600 F.2d 786, 789 (1979). As Judge Mayer stated in *Cornetta*, 851 F.2d at 1378 (citations omitted):

> There are two types of prejudice that may stem from delay in filing suit. First the government may be unable to mount a defense.... "Defense prejudice" may include loss of records, destruction of evidence, fading memories, or unavailability of witnesses.... The second type, economic prejudice, centers on consequences, primarily monetary, to the government should the claimant prevail....
>
> Notwithstanding any intimations in our earlier cases to the contrary, ... we reject the notion that the government can rely on a presumption of prejudice, or shift the burden to plaintiff to show lack of prejudice if delay is long, to support the affirmative defense of laches.

In the case at bar, the government first asserts that the length of Travelers' delay makes its burden to show prejudice lighter. As *Cornetta* makes clear, this principle is no longer viable, and the court must therefore consider the government's claim of

defense prejudice without regard solely to the length of delay by Travelers. The government further informs the court— that "documentation pertaining to the case has been possibly destroyed;" that "memories of the persons involved have faded and at least one such person has died"; that in light of the number of persons who served in the position of Resident Engineer, "it would be difficult or impossible to locate many of these persons after such a long period of time due to transfer, retirement, and death." *See* Defendant's Reply Brief at 8.

It is enough to say that the court does not find these bland conclusory averments to be sufficient grounds for a finding of prejudice as a matter of law, especially when it considers the amount of correspondence between the two parties (respecting a forthcoming claim) prior to the filing of the claim. The government well knew no later than February 1982 (and possibly earlier if knowledge of the alleged wrongful payments is imputed to it), that Travelers would be filing a claim. Simply stated, the government should have, and certainly could easily have, taken some precautions in preserving pertinent documentary evidence and what otherwise it deemed to be the vitality of its defense. The awareness of this factor to the government having been repeatedly forewarned of the pending suit is in sharp contrast to the government's positions in *LaCoste* or *Zinger*, where little or no forewarnings were made. To find for defendant on this issue would be tantamount to benefitting it for its own wrong.

Therefore, the defendant's motion for summary judgment is denied.

*Conclusion*

The court has carefully considered every argument raised by the defendant in support of its motions for dismissal and for summary judgment. Notwithstanding, and for the above-stated reasons, the court is constrained to deny both of the defendant's motions.

Pursuant to Appendix G of the RUSCC, the following schedule shall now apply in this case:

1. All discovery shall be completed by February 28, 1989 (Section IV, Appendix G);

2. The memoranda called for by paragraphs 11–15 and 17 of Section V of Appendix G shall be filed by both parties on or before March 31, 1989;

3. The pretrial conference shall be held at 10:00 a.m., Friday, April 7, 1989, in the National Courts Building, 717 Madison Place, N.W., Washington, D.C. 20005. A trial date will be set at that time.

IT IS SO ORDERED.