**UNITED PACIFIC INSURANCE COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 91–1448C.

United States Claims Court.

July 6, 1992.

Jan D. Sokol, Portland, Or., for plaintiff. Stafford Frey Cooper & Stewart, of counsel.

Virginia M. Lum, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant. Elizabeth Becker, Office of General Counsel, U.S. Dept. of Agriculture, of counsel.

## OPINION

NETTESHEIM, Judge.

This case is before the court on defendant's motion to dismiss for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted pursuant to RUSCC 12(b)(1), (4). Argument is deemed unnecessary.

## FACTS

United Pacific Insurance Company ("plaintiff"), as surety, seeks a refund of

interest payments paid to the United States Department of Agriculture ("USDA") and the United States Forest Service (the "Forest Service"), as a condition of its principal's entitlement to relief pursuant to the buy-out provisions of the Federal Timber Contract Payment Modification Act (the "FTCPMA"), 16 U.S.C. § 618 (1988). Defendant asserts that jurisdiction is lacking because plaintiff has no privity of contract with the Government or right of subrogation, the Secretary of Agriculture has no authority to make a refund, and 16 U.S.C. § 618 does not mandate the payment of money. Defendant's contention that the complaint fails to state a claim for relief is based on plaintiff's payment of interest without reservation.

The Secretary of Agriculture administers the National Forest System through the Forest Service. The Forest Service sells to private companies the right to harvest timber on National Forest System lands. Contracts for timber sales obligate purchasers to cut and remove the timber within a specified time period. Payment under these contracts is based upon the actual volume of timber removed. Defaulting purchasers must pay damages to the Forest Service in the amount of the difference between the contract price and the price at which the timber can be resold.[1]

Timber prices fell dramatically in the early 1980's. As a result many timber purchasers were left with contract obligations far exceeding the market value of the timber. The Forest Service, in response, authorized extensions of time for contract performance in exchange for extension deposits. Subsequently, the Forest Service permitted purchasers to defer payment of the extension deposits but required them to pay interest on the amount deferred.[2]

On September 5, 1978, the Forest Service and Webco Lumber, Inc. ("Webco"), entered into a contract for the sale of timber (the "Snow Timber Sale"). On July 7, 1981, the Forest Service and Webco entered into a second contract for the sale of timber (the "Modification Timber Sale"). Plaintiff executed and delivered timber performance bonds payable to the United States of America on behalf of Webco for both contracts.[3]

The two contracts subsequently were modified to allow for extension of the contracts in exchange for extension deposits.[4] The contracts were modified again [5] to include provision "C4.251#—Deferral of Extension Deposits (11/82)" which states, as follows:

Notwithstanding the requirements of C4.252#—Extension Deposits, Purchaser may elect in writing to defer cash payments of Extension Deposits. If such an election is made, Purchaser shall pay interest in cash on the amounts deferred at the annual rate of 13.0 percent for each month or portion thereof. Cash payment of all accumulated interest will be billed monthly and shall be due within 15 calendar days of billing by Forest Service.[6]

On July 5, 1983, Forest Service Contracting Officer John G. Lindner notified Webco in two separate letters that it was in breach of both the Snow and Modification Timber Sales contracts because of Webco's failure to pay interest on the deferred extension

1. The court in *Sierra Pacific Industries v. Lyng,* 866 F.2d 1099, 1103–04 (9th Cir.1989), explicated the background, economic, and historic conditions leading up to the adoption of the FTCPMA.

2. *See generally Sierra Pac. Indus. v. Lyng,* 866 F.2d at 1103–04.

3. The record is unclear as to exactly when the performance bonds were issued and what terms the performance bond contract contained.

4. The record is unclear as to exactly how and when these extension deposit contracts were made.

5. The Snow Timber Sale contract was modified on May 26, 1983, and the Modification Timber Sale contract was modified on December 30, 1982.

6. The language quoted is contained in the Snow Timber Sale extension deposit provision. The language in the Modification Timber Sale extension deposit differs in that it begins with "Notwithstanding the requirements of C4.25 (Option 1)" and contains an interest rate of 11.98 percent.

deposits. The letters stated that pursuant to the underlying timber sale contracts, Webco had "30 calendar days from receipt of this notice to remedy the breach. If payment is not received within this period, I will recommend to the Regional Forester that this contract be canceled for breach." A copy of the letter was sent to plaintiff.

In letters dated December 5, 1983, the contracting officer notified Webco that the contracts had been terminated on November 30, 1983. Additionally, the letter responded to a November 30, 1983 letter of Webco requesting a 5-year contract term extension:

> In order to qualify for an extension under the Multi–Sale Extension Program, or an extension under any other authority, the Purchaser must be in substantial compliance with the terms of the contract. Any existing breach must be remedied by the Termination Date. [These contracts have] been in breach of C4.251#—Deferral of Extension Deposits (11/82) since July 1, 1983, and terminated in default on November 30, 1983.

On October 16, 1984, President Reagan signed the FTCPMA, which provides, in pertinent part:

> [T]he Secretary of Agriculture for national forest lands and the Secretary of the Interior for public lands under their respective jurisdictions are authorized and directed to permit a requesting purchaser to return to the Government a volume of the purchaser's timber contracts as determined under paragraph (2) upon payment of a buy-out charge from such purchaser in an amount as determined under paragraph (3). The purchaser shall be released from further obligation to cut, remove, and pay for timber under such contract upon payment, or arrangement for payment as provided under paragraph (3)(E), of such buy-out charge and completion of any

obligation required pursuant to subsection (4)(B). The Government does not hereby surrender any other claim against a purchaser which arose under a contract prior to effectuation of this release and not in connection with this release from obligation to cut, harvest and pay for timber.

16 U.S.C. § 618(a)(1).

In letters dated May 9, 1986, Forest Service Contracting Officer John P. Schlotter informed Webco that it was entitled to relief under the Act, but that as a precondition, Webco would have to pay the interest due on the extension deposits: "Your application for buy-out of timber sales under the Federal Timber Contract Payment Modification Act was approved by the Regional Forester on November 6, 1985.... [T]he Forest Service indicated that a condition of buy-out was payment of interest on deferred extension deposits under contract provision C4.251# dated November, 1982." The letters went on to explain the Forest Service's authority to collect the interest payments:

> Please be advised that this interest is still due the Government and that we cannot proceed to close these sales until it is paid. Because this is a payment due under 36 C.F.R. § 223.177(d) [7] (buy-out regulations) and is also a breach of contract, the Government can declare the sale ineligible for buy-out if the breach is not remedied.

The letter also indicated that Webco had the option of entering into an agreement for partial sale in exchange for fully funding the debt through bonding and gave Webco the option of using "current performance bonds" with consent of Webco and plaintiff as surety.

In a letter dated May 27, 1986, from Barbara A. Webb, President of Webco, to Contracting Officer Schlotter, Webco in-

---

7. 36 C.F.R. § 223.177(d) (1988), provides:

**Remedy for breach.** Before the Forest Service will accept a conditionally returned contract for buy out, the purchaser shall remedy any contract breach or other aspect in which work performed to date is not in full compliance with the terms of the contract, except that a contract not in default but in breach only because of failure to pay extension deposits, and/or removal schedule payments, shall become eligible for buy out when payment of the full amount of interest due up to the date of the purchaser's buy out application is received by the Regional Forester.

formed the Forest Service that the Forest Service could use "current performance bonds to secure interest on deferred extension deposits alleged by the Forest Service to be due under the subject timber sale contracts...." The letter noted that Webco had advised its surety, UPIC, of the need for current performance bonds and expected UPIC to send written consent to the Forest Service regarding their use.

Webco appealed the Regional Forester's decision that payment of interest owed by Webco be a condition of buy-out under the FTCPMA. In a June 27, 1986 letter, Forest Service Chief R. Max Peterson notified Webco that he had affirmed the Regional Forester's decision.

By letter of July 25, 1986, plaintiff's attorney informed the Forest Service that it would pay the interest as a condition of the buy-out of the contracts:

Although we totally disagree with the Chief's decision in this matter, we believe that further litigation would be expensive. Accordingly, in exchange for a full release, and exoneration of the above mentioned bonds,[8] we are prepared to pay the Forest Service the interest payments of $11,546.29 due on the Snow Timber Sale and $40,078.08 due on the Modification Timber Sale. Please provide me with the appropriate documents so that we can consummate this settlement.

Subsequently, Ms. Webb and Contracting Officer Schlotter signed contract closure agreements dated August 26, 1986, for the contracts that provided:

Webco Lumber, Inc., and the United States of America, acting through the Forest Service, agree that all of the following conditions relating to the ... [contracts] have been met:

1. Purchaser has made timely payment, or arrangement for payment (36 CFR 223.181), of the applicable buy out cost; and,

2. Any Government claim other than those listed below, which has been asserted by the Contracting Officer prior to the date of this agreement, has been fulfilled; and

3. If this contract is a conditionally returned contract, the conditions prescribed by the Regional Forester (36 CFR 223.177) have been timely completed.

Purchaser agrees that the Government is released from all claims arising from this contract.

Therefore, it is agreed that Purchaser and Forest Service are released from all rights and obligations under this contract, and that this contract is hereby closed.

In a letter dated April 29, 1987, plaintiff, on behalf of Webco, requested that the Forest Service refund the interest payments plaintiff had paid as Webco's surety. Plaintiff based its request on two federal district court decisions, *Sierra Pacific Industries v. Block*, 643 F.Supp. 1256 (N.D.Cal.1986), and *Big Flat Timber Co. v. Block*, Civ. No. 85–501 (D.Or. [date unavailable], 1987) (unpubl.). Plaintiff claimed that these decisions were "directly contrary to the prior decision of the Regional Forester of November 6, 1985, and the affirmation of that decision by the Chief Forester on June 27, 1986." [9]

In a letter dated May 8, 1987, Contracting Officer Schlotter responded to plaintiff's demand, stating:

We have received your letter of April 29, 1987, on Webco Lumber, Inc. and the two buy-out timber sales. We have looked at the record and cannot agree to refund the monies you have requested because the interest which was paid as a condition of buy-out, accrued prior to the time of the proposed relief in the litigation you referred to.

For your information, I have been advised that both decisions you described in

---

8. Snow Timber Sale # 061087; Bond No. U 05 95 56; Modification Timber Sale # 064180; Bond No. U 35 95 43.

9. These cases were combined on appeal in *Sierra*, wherein the Ninth Circuit upheld the Government's requirement that harvest schedules be revised as a pre-condition of buy-out.

your last paragraph will probably be appealed to the Appellant [sic] Court.

Plaintiff again requested a refund on May 28, 1987. The Forest Service again rejected the request in a June 5, 1987 letter from Contracting Officer Schlotter stating that until the *Big Flat* and *Sierra* cases are settled, the Forest Service has "no opportunity to consider your request for refund of any monies."

In a letter dated February 16, 1989, Contacting Officer Schlotter wrote to plaintiff indicating that he did "not believe the Government is required to return the interest payments made by United Pacific Insurance Company as a condition of buy-out."

Responding to another letter from plaintiff, Contracting Officer Schlotter wrote to plaintiff on March 6, 1989:

I have received your letter of February 24, 1989, asking for clarification of my February 16, 1989 letter. Please be advised that my letter was not a final decision that United Pacific is or is not entitled to a refund of the interest paid in connection with the "buy-out" of the subject sales.

I am forwarding your letter and all recent correspondence on this subject to our regional office in Portland for further study by our contract specialists and general council [sic]. Since I am not familiar with the Big Flat and Sierra Pacific cases, I will need to wait until further advised as to their implications before I can determine if United Pacific Insurance Company is entitled to a refund of the interest payments.

In response to a further letter from plaintiff, Contracting Officer Schlotter stated in an October 27, 1989 letter:

Your inquiry of October 17, 1989, has been received. I have been advised by our Regional Office that the Forest Service is still in litigation over the issue surrounding the Big Flat and Sierra Pacific cases. I cannot consider your request for refund of interest on extension deposits for the subject timber sales, until I am advised that the litigation has been completed.

Another communication dated March 20, 1990, from Contracting Officer Schlotter stated:

I have received your letter of February 8, 1990, and finally have something more concrete on the subject sales and the possibility of a refund of interest on extension deposits.

I have been advised by our Regional Office that I can expect some instructions on how to process requests for refunds for extension deposits, in approximately a month.

I will contact you when I have received these instructions and have determined how to proceed with these cases. Thank you for your patience.

The record reveals no further communication between the Forest Service and plaintiff. No refund was offered to plaintiff.

On September 20, 1991, plaintiff filed suit in the Claims Court asserting its right to a refund from the Forest Service of interest payments in the amount of $11,546.29 on the Snow Timber Sale contract and $40,078.08 on the Modification Timber Sale contract pursuant to 16 U.S.C. § 499. In the alternative plaintiff requested that the court direct the Secretary of Agriculture to make a refund of the interest in the amount of $51,624.37. Plaintiff alleges that the interest payments were wrongfully collected.

## DISCUSSION

I. Defendant requests dismissal for lack of subject matter jurisdiction. When evaluating a RUSCC 12(b)(1) motion, the court must accept as true any allegations of fact made by the non-movant. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988). In *W.R. Cooper General Contractor, Inc. v. United States*, 843 F.2d 1362, 1364 (Fed.Cir.1988), the court stated: "In cases such as this in which a party has moved to dismiss for lack of jurisdiction, we must consider the facts alleged in the complaint to be correct. If these facts reveal any possible basis on

which the non-movant might prevail, the motion must be denied." (Citing *Scheuer v. Rhodes*, 416 U.S. at 236, 94 S.Ct. at 1686; additional citations omitted.) However, the burden is on the plaintiff to establish jurisdiction. *Reynolds*, 846 F.2d at 748 (citing cases).

### 1. *Privity*

The Tucker Act provides the Claims Court with threshold jurisdiction to hear certain suits against the sovereign. *United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 953–54, 47 L.Ed.2d 114 (1976). However, the Tucker Act does not create a substantive right of recovery against the United States for money damages. *Eastport Steamship Corp. v. United States*, 178 Ct.Cl. 599, 605–07, 372 F.2d 1002, 1007– 09 (1967). Claimants must sue under the Constitution, an Act of Congress, a regulation, or an express or implied contract with the United States. 28 U.S.C. § 1491(a)(1); *United States v. Connolly*, 716 F.2d 882, 885 (Fed.Cir.1983) (en banc), *cert. denied*, 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984).

■ Defendant argues that plaintiff's claim must be dismissed for lack of jurisdiction because plaintiff, as surety, lacks privity of contract with the Government. Privity of contract is a jurisdictional prerequisite, as 28 U.S.C. § 1491(a)(1), grants the Claims Court "jurisdiction to render judgment upon ... any express or implied contract with the United States."

The Supreme Court in *Baltimore and Ohio R.R. v. United States*, 261 U.S. 592, 597, 43 S.Ct. 425, 426–27, 67 L.Ed. 816 (1923), explained that a contract implied in fact is "founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in light of the surrounding circumstances, their tacit understanding." *See also H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1575 (Fed.Cir.1984). The elements necessary to establish either an express or implied contract are similar. The United States Court of Claims in *Fincke v. United States*, 230 Ct.Cl. 233, 244, 675 F.2d 289,

295 (1982), stated that "an implied contract requires the same elements as an express contract, i.e., an offer, acceptance and consideration." (Citing *Baltimore & Ohio R.R.*, 261 U.S. 592, 43 S.Ct. 425, 67 L.Ed. 816.)

Plaintiff has not alleged facts that demonstrate either an express or an implied-in-fact contract. Plaintiff refers to no express agreement between itself and the Forest Service, nor does plaintiff allege that the Forest Service and it undertook corresponding obligations and liabilities, or that there was a meeting of the minds between itself and the Forest Service, or that it gave any kind of consideration to the Forest Service.

The record does show that plaintiff, as surety and therefore obligor, issued performance bonds to the principal, Webco, for the benefit of the Forest Service. The issuance of bonds constituted a contract between plaintiff and Webco. The record does not indicate that the Government was a party to, or undertook any obligations under, this suretyship contract.

Defendant also asserts that courts have limited a surety's ability to assume privity of contract with the Government to cases where a takeover agreement has been executed between the Government and the surety. Defendant points to *Travelers Indemnity Insurance Co. v. United States*, 16 Cl.Ct. 142 (1988), but overstates the case. *Travelers* suggests that a surety with a takeover agreement is in a stronger position to sue the Government. It does not limit a surety's ability to assume privity of contract with the Government to situations where a takeover agreement has been executed:

As Travelers, here, has executed such a takeover agreement, it necessarily possesses greater rights to sue the Government than might a non-completing surety.... It is, therefore, the holding of this court that where a surety has executed a takeover agreement, as here, upon the default of the prime contractor in order to complete the work under *the* construction contract, it becomes [a party to the Government contract]....

16 Cl.Ct. at 153; *see also Carchia v. United States*, 202 Ct.Cl. 723, 735, 485 F.2d 622, 628–29 (1973). In the instant case, plaintiff does not allege, and the facts do not indicate, that a takeover agreement had been either entered into or executed.

Since plaintiff cannot show either that the Forest Service and it intended a contract, as to the rights and obligations of the original contract, or that a takeover agreement existed, no express or implied-in-fact contract is present that would give plaintiff privity with the Forest Service and consequently a right to sue in the Claims Court. Privity, however, may still be available to plaintiff under the equitable doctrine of subrogation.

### 2. *Subrogation*

█ The traditional means for a surety to assert a claim against the Government is through the equitable doctrine of subrogation. *Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1161 (Fed.Cir.1985). Under the theory of subrogation, a surety is

> entitled to the benefit of *all* the rights of the laborers and materialmen whose claims it paid and those of the contractor whose debts it paid. The surety then is subrogated to the rights of the contractor who could sue the Government since it was in privity of contract with the United States. The surety is likewise subrogated to the rights of the laborers and materialmen who might have superior equitable rights to the retainage but no right to sue the [United States].

(Citing *United States Fidelity & Guar. Co. v. United States*, 201 Ct.Cl. 1, 10, 475 F.2d 1377, 1382 (1973).) Courts often discuss two factors necessary for a party to assert a right of subrogation. First, the Government must be acting as a stakeholder. Second, the surety must be asserting the rights of the principal. *See Washington Int'l. Ins. Co. v. United States*, 16 Cl.Ct. 663, 666, *aff'd*, 889 F.2d 1101 (Fed.Cir.1989) (Table).

Defendant argues that since the Forest Service is not acting as a stakeholder, plaintiff cannot assert a right of subrogation. For the Forest Service to be acting as a stakeholder, it must be holding retainage. Retainage generally refers to unexpended contract funds that the Government has allocated for expenditure on the contract, but has not yet disbursed. *Balboa*, 775 F.2d at 1161.[10]

The case at bar presents a novel issue with regard to the requirement that the Government must act as stakeholder. Typically, when a surety sues the Government under a right of subrogation, the claim naturally involves retainage. This is because the surety is generally suing the Government for funds that the Government has allocated for expenditure on the principal's performance or has already paid to the principal. The Government has contracted for performance and the surety is demanding payment for completing the performance. For example, in *Balboa*, the surety sued the Government for funds that the Government was retaining on its contract with the principal. *See also Ransom v. United States*, 900 F.2d 242 (Fed.Cir.

---

**10.** A surety can sue for retainage under either a payment or performance contract. Previous cases have focused on distinguishing between a payment bond and a performance bond. For example, in *Dependable Insurance Co. v. United States*, 846 F.2d 65, 66–67 (Fed.Cir.1988), the court noted that "under a performance bond, a surety guarantees that the project will be completed if a contractor defaults.... [U]nder a payment bond, in contrast, a surety is required to pay subcontractors, materialmen, and laborers if the prime contractor fails to do so."

In a payment contract, a surety may have to pay subcontractors, materialmen, or laborers to complete a contract upon which the principal defaults. The surety can then sue the Government for the money that it was supposed to pay the principal, but which it still retains. Likewise, in a performance contract, the surety can actually undertake the work itself and then, if necessary, sue the Government for retainage.

While the distinction is less important in the case at bar, both parties have referred to the surety's bonds as performance bonds—the USFS in a letter dated May 9, 1986, and Webco in a letter dated May 27, 1986. Under the type of timber contracts in question, a surety is responsible for defaulting purchasers that must pay damages to the USFS in the amount of the difference between the contract price and the price at which the timber can be resold. This ensures that the Government's contractual expectations are realized.

1990); *Dependable Ins. Co. v. United States*, 846 F.2d 65 (Fed.Cir.1988); *Royal Indem. Co. v. United States*, 208 Ct.Cl. 809, 529 F.2d 1312 (1976); *Argonaut Ins. Co. v. United States*, 193 Ct.Cl. 483, 434 F.2d 1362 (1970); *Employers Ins. of Wausau v. United States*, 23 Cl.Ct. 579 (1991); *Fidelity & Deposit Co. v. United States*, 14 Cl.Ct. 421 (1988); *Travelers*, 16 Cl.Ct. 142; *Transamerica Ins. Co. v. United States*, 6 Cl.Ct. 367 (1984).

The situation in the case at bar, however, differs in that traditional retainage is not involved. The surety cannot sue for retainage because the Government was not in the role of contracting for performance. Instead, the Forest Service was contracting for payment. The Forest Service wanted payment in exchange for allowing Webco to cut timber. Under the surety bond, plaintiff contracted to pay damages to the Forest Service in the amount of the difference between the contract price and the price at which the timber could be resold. When Webco defaulted, plaintiff paid what the Forest Service claimed was a lawful settlement amount.

The money that plaintiff paid to the Forest Service does not fit the narrow definition of retainage, which the case law employs, because it is not money that the Government has allocated for expenditure on a contract; rather, it is money that the Government has received under a contract. Here, the plaintiff-surety is seeking money that it has paid to the Forest Service for the Forest Service's performance—what may be referred to as a "Government-payment-situation" and not money that it asserts the Forest Service should have paid to it for its performance—what can be termed a "Government performance situation." In a Government-payment situation,

retainage cannot exist. Therefore, application of the Government-as-stakeholder requirement does not make sense in a Government payment situation, because it automatically denies the right of subrogation to a whole class of suretyship relationships.

The only case involving a Government-payment situation relied upon by defendant to support its contention that plaintiff cannot assert a right of subrogation against the Forest Service because the Forest Service was not acting as a stakeholder is *Washington International Insurance*, 16 Cl.Ct. 663. While *Washington* was dismissed for lack of subject matter jurisdiction, it is factually distinct from the case at bar.

*Washington* was dismissed because the plaintiff-surety failed to meet the requirement that the surety be asserting the rights of the principal, not its own rights. To fulfill this requirement, the surety must be "stepping into the shoes of the principal." *Washington*, 16 Cl.Ct. at 666. In *Washington* the plaintiff surety was asserting its own rights against the Government. The thrust of the surety's argument was that under 19 C.F.R. § 142.15 (1988),[11] and 19 C.F.R. § 172.1 (1988),[12] the Government should have notified it immediately, in writing, and at the same time as the principal. Since the surety was not so notified, the Government breached its obligation to the surety. Therefore, the surety was attempting to assert its own rights and not the rights of the principal.

In the case at bar, defendant argues that the plaintiff surety, as in *Washington*, is trying to assert its own rights. In fact, plaintiff is asserting the rights of the principal. The surety in *Washington* attempted to assert rights derived out of a statute

---

**11.** 19 C.F.R. § 142.15 provides, in pertinent part:

> If the entry summary documentation is not filed timely, the district director shall make an immediate demand for liquidated damages in the entire amount of the bond in the case of a single entry bond....

**12.** 19 C.F.R. § 172.1, entitled "Notice of liquidated damages incurred and right to petition for relief," mandates, in pertinent part:

> (a) ... When there is a failure to meet the conditions of any bond posted with Customs, the principal shall be notified in writing of any liability for liquidated damages incurred by him and a demand shall be made for payment. The securities on such bond shall also be advised in writing, at the same time as the principle, of the liability for liquidated damages incurred by the principle.

giving rights directly to sureties in the type of contract at issue. In this case, however, plaintiff argues that the principal should not have been obligated to pay the interest payments as a precondition of the buy-out. If this were true, and the principal had made payment, the principal could sue the Forest Service for reimbursement. Since the principal is entitled to sue for refund of its money, the surety is entitled to sue for refund of money that it paid erroneously on behalf of the principal. The surety is not asserting its own rights, but the rights of the principal not to pay.

In *First National City Bank v. United States*, 212 Ct.Cl. 357, 369 548 F.2d 928, 936 (1977), the Court of Claims stated:

As a general rule, subrogation applies where a party not acting voluntarily, but under some compulsion pays a debt or discharges an obligation for which another is primarily liable and which in equity and good conscience ought to be discharged by the latter. In such circumstances, the subrogee "stands in the place" of the original creditor and obtains equivalent but no greater rights against the debtor than held by the original creditor.

(Citations omitted.) Since plaintiff completed the contract pursuant to its performance bond (by paying the interest payments), it is subrogee of the Forest Service. Because plaintiff is standing in the shoes of the principal by asserting the principal's right not to pay, jurisdiction based on subrogation is valid.

3. *Propriety of government action*

Plaintiff argues that the Forest Service's collection of interest payments as a condition of buy out was wrongful and therefore that it is entitled to a refund under 16 U.S.C. § 499. Defendant responds that the Secretary of Agriculture does not possess refund authority pursuant to 16 U.S.C. § 499 and that payment of the interest payments constituted an accord and satisfaction. These arguments need not be reached, however, until it is determined that the Forest Service wrongfully collected the interest payments as a condition of buy out. If the Government was not wrongful in collecting the interest payments as a condition of buy out, then the issue of whether or not the Secretary of Agriculture has authority to make a refund under 16 U.S.C. § 499 is moot. In other words, the issue of whether or not the Secretary of Agriculture has the authority to make a refund is only relevant if the Government's collection of the interest payments was wrongful.

II. Defendant's motion to dismiss for failure to state a claim upon which relief can be granted should be dismissed unless it appears that there is no set of facts the plaintiff could allege which would support its claim: "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *see also Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed.Cir.1989). Therefore, if the court can discern a possible scenario under which plaintiff could recover, defendant's motion to dismiss for failure to state a claim upon which relief can be granted must be denied.

Plaintiff never explains or otherwise supports its contention that the Forest Service wrongfully demanded the interest payments as a precondition of buyout. Repeatedly, plaintiff states: "The Department of Agriculture has wrongfully and erroneously demanded and required that Webco pay interest on extension deposits on the Snow and Modification Timber Sales...." Plf's Compl. filed Sept. 20, 1991, ¶ 12; *see also* Plf's Br. filed Apr. 17, 1992, at 2, 7, but plaintiff never amplifies its contention with factual particulars. Its strongest argument is that "the Government never attempts to controvert plaintiff's rightful entitlement to the interest payments" paid to the Forest Service. Plf's Br. filed Apr. 17, 1992, at 2.

The FTCPMA specifically preserved the Government's right to claims beyond the payment necessary to cover the buy-out. The FTCPMA states that, in approving a contractor for buy-out under the Act, the

Government does not surrender any other claim against a purchaser:

> The Government does not hereby surrender any other claim against a purchaser which arose under a contract prior to effectuation of this release [buyout] and not in connection with this release from obligation to cut, harvest and pay for timber.

16 U.S.C. § 618(a)(1). The Act's explicit language justifies the Forest Service's demand for the satisfaction of pre-existing claims as a condition precedent to buy-out.

The court in *Sierra,* upholding the Government's requirement that harvest schedules be revised as a pre-condition of buy-out, supports this interpretation. According to the Ninth Circuit, the statute "explicitly preserves" the "government's pre-existing claims against timber purchasers." 866 F.2d at 1109. Although plaintiff's forced payment of interest payments is not precisely analogous to the forced revision of harvest schedules in *Sierra,* both arise from pre-existing obligations due under the original contract and impose costs in addition to the cost of the buy-out. In addition, the buy-out regulation in 36 C.F.R. § 223.177(d), "Conditions and Limitations on Return of Timber Sale Contracts, Remedy for Breach," provides:

> Before the Forest Service will accept a conditionally returned contract for buy out, the purchaser shall remedy any contract breach or other aspect in which work performed to date is not in full compliance with the terms of the contract, except that a contract not in default but in breach only because of failure to pay extension deposits, and/or removal schedule payments, shall become eligible for buy out when payment of the full amount of interest due up to the date the purchaser's buy out application is received by the Regional Forester.

Given this statutory and regulatory framework, the Forest Service's imposition of interest payments previously owed under the contracts as a precondition of buy out appears to be lawful under the FTCPMA. Since the Forest Service did have the right to collect the interest payments as a precondition of buy out, it would appear also that plaintiff's complaint should be dismissed for failure to state a claim upon which relief can be granted.

## CONCLUSION

Accordingly, based on the foregoing, defendant's motion to dismiss pursuant to RUSCC 12(b)(1) is denied. Since defendant did not make the specific argument addressed by the court in respect of Rule 12(b)(4), plaintiff shall have an opportunity to respond and defendant to reply. Therefore,

IT IS ORDERED, as follows:

1. Plaintiff shall file its response by July 16, 1992, with service by overnight express mail.

2. Defendant shall file its reply by July 27, 1992, with service by overnight express mail.